PEOPLE v BROWN

Docket No. 139411. Submitted November 2, 1993, at Detroit. Decided
September 6, 1994, at 9:00 A.M. Leave to appeal sought.

Kevin A. Brown was convicted following a joint bench trial in the
Detroit Recorder's Court, M. John Shamo, J., of two counts of
second-degree murder, one count of assault with intent to
commit armed robbery, and possession of a firearm during the
commission of a felony. The defendant was sentenced to concur-
rent prison terms of twenty to forty years for the murder and
assault convictions, and to a consecutive term of two years for
the felony-firearm conviction. The defendant appealed.

The Court of Appeals *held:*

The defendant's convictions and sentences are affirmed.

P. E. DEEGAN, J., in an opinion with which GRIBBS, P.J.,
concurred in the result only, stated: ·

1. The defendant's privilege against compelled self-incrimina-
tion, as guaranteed by Const 1963, art 1, § 17 and protected by
the procedural safeguards in *Miranda v Arizona,* 348 US 436;
86 S Ct 1602; 76 L Ed 2d 694 (1966), and the defendant's right
to counsel, as secured by Const 1963, art 1, § 20, were not
violated during the defendant's second interrogation while in
police custody when the police officer conducting the interroga-
tion failed to inform the defendant that an attorney retained
by his mother was available and waiting to confer with him.
The trial court correctly refused to suppress evidence of the
defendant's voluntary statement at the second interrogation
session.

2. The trial court did not err in denying the defendant's
request for a separate trial or in admitting evidence of the
statements of the codefendants.

3. The defendant's sentences do not violate the principle of
proportionality.

SHEPHERD, J., dissenting, stated that the right to counsel
under Const 1963, art 1, § 20 and the right against compelled
self-incrimination under Const 1963, art 1, § 17 encompass the
right to be informed about retained counsel's attempts to
contact the suspect. The case should be reversed and remanded
for a new trial at which evidence of the defendant's statement
at the second interrogation session would be excluded.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of Research, Training, and Appeals, and *Nancy A. Neff,* Assistant Prosecuting Attorney, for the people.

*Cyril C. Pessina,* for the defendant on appeal.

Before: Gribbs, P.J., and Shepherd and P. E. Deegan,* JJ.

P. E. Deegan, J. I agree with Judge Shepherd's recitation of the facts.

I also agree with Judge Shepherd that we should defer to the trial court with respect to its findings of fact regarding the police activity during the questioning of the defendant. Defendant alleged that the police engaged in a variety of improper behavior, including the misrepresentation of the defendant's whereabouts to an attorney. Judge Shepherd concluded, and I agree, that "there is no evidence that they deliberately tried to conceal [the] defendant's location." *Post* at 547.

I further agree that the most important issue regarding the defendant's second statement is "whether the officers' [failure] to inform defendant of [an] attorney's attempts to contact him," *post* at 547, violated the privilege against compelled self-incrimination as guaranteed by Const 1963, art 1, § 17 and protected by the procedural safeguards in *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 76 L Ed 2d 694 (1966), or the right to counsel as secured by Const 1963, art 1, § 20, or both.

However, I do not agree with Judge Shepherd that the facts of this case justify extending the privilege against compelled self-incrimination. I do

* Circuit judge, sitting on the Court of Appeals by assignment.

not believe the police in this case were required to interrupt their interrogation of the defendant in order to inform him that an attorney, hired by a third party, was asking to talk with him. I find it significant that the defendant made a knowing and voluntary waiver of his privilege against self-incrimination, and that he never indicated to the police that he wanted an attorney.

The facts of this case differ in several important respects from those in *People v Wright,* 441 Mich 140; 490 NW2d 351 (1992). In *Wright,* the police did not advise the defendant of his constitutional rights until he had been in custody for over five hours. In the instant case, the police read the defendant his rights shortly after he voluntarily walked into the police station. The police in this case, in contrast to the police in *Wright,* reread to the defendant his rights before questioning him a second time. The defendant here, unlike the defendant in *Wright,* signed a standard constitutional rights notification form each time before he was questioned. The police stated that when they advised the defendant of his constitutional rights he declared that he understood those rights; he did not appear to be under the influence of any chemical substance, and he was cooperative. The defendant never asked to telephone a family member or a lawyer.

In *Wright,* the police engaged in coercive behavior. They deprived the defendant of food, and only gave him some water after nine hours in custody. They placed the defendant in a small room, four feet by five feet, in order to get him to confess. In addition, they threatened to charge the defendant with first-degree murder unless he confessed. Indeed, Justice BRICKLEY, in his concurring opinion in *Wright,* makes it clear that Wright's statement should have been suppressed because "he was

deprived of food, sleep, and contact with friendly outsiders, combined with the fact that he was not informed of available retained counsel." *Id.* at 172. Justice BRICKLEY expressly relied on "[t]he sum of these circumstances" in his decision to concur in the result in *Wright. Id.*

The police in the present case provided breakfast for the defendant, and did not engage in any coercive behavior similar to that in *Wright.* The police treated the defendant justly. That is evidenced by the defendant's second statement, in which he wrote the word "fair" in response to how he had been treated.

Because the facts in this case are not egregious and are dissimilar to those in *Wright,* I adopt the rationale of Justice RILEY, dissenting in *Wright, supra* at 172-180 (BOYLE and GRIFFIN JJ., concurring).

In her dissenting opinion, Justice RILEY relied on the United States Supreme Court's opinion in *Moran v Burbine,* 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), which was written by Justice O'Connor for the six-member majority. *Id.* at 415-434. Judge SHEPHERD suggests that we adopt Justice MALLETT's analysis in *Wright, supra* at 142-155. I am convinced that such a decision would establish a "rule that focuses on how the police treat an attorney—conduct that has no relevance at all to the degree of compulsion experienced by the defendant during interrogation—[and] would ignore both *Miranda*'s mission and its only source of legitimacy." *Moran, supra* at 425.

Moreover, I believe that Judge SHEPHERD's suggestion would create a multiplicity of needless and confusing legal questions for Michigan courts when applying *Miranda,* for example:

To what extent should the police be held ac-

countable for knowing that the accused has coun-
sel? Is it enough that someone in the station house
knows, or must the interrogating officer himself
know of counsel's efforts to contact the suspect? Do
counsel's efforts to talk to the suspect concerning
one criminal investigation trigger the obligation to
inform the defendant before interrogation may
proceed on a wholly separate matter? [*Moran,
supra* at 425.]

In short, Judge SHEPHERD's suggestion would cre-
ate in Michigan a Gordian knot concerning *Mi-
randa* rights.

Because the facts of this case are distinguishable
from those in *Wright* and I am convinced that the
reasoning in Justice O'Connor's majority opinion
in *Moran* is superior, I find the decision of the
police not to inform the defendant, while interro-
gating him, of an attorney's attempts to contact
him did not violate the privilege against compelled
self-incrimination as guaranteed by Const 1963,
art 1, § 17 and protected by the procedural safe-
guards in *Miranda.* Accordingly, I find no error in
the trial court's decision not to suppress the defen-
dant's second statement.

I am also convinced that the right to counsel as
secured by Const 1963, art 1, § 20 does not include
the right to be informed that counsel, retained by
a third party, is attempting to contact the suspect.

The general rule [is] that a defendant has no
right to counsel until the right attaches automati-
cally after the initiation of adversarial judicial
criminal proceedings. . . . [An] exception [exists]
for pretrial identification procedures . . . because
of the unique elements of confrontation that these
procedures present. . . . Normal custody interroga-
tions have never been analyzed under the right to
counsel simply because that right has not yet
attached at this investigative stage. [*Wright, supra*

at 173, n 4 (Justice Riley dissenting in an opinion joined by Justices Boyle and Griffin).]

Therefore, I do not find that the defendant's second statement was obtained in violation of the right to counsel as guaranteed by Const 1963, art 1, § 20. Accordingly, I find no error in the trial court's refusal to suppress the defendant's second statement.

Notwithstanding established Michigan case law to the contrary, Judge Shepherd would extend the right to counsel to encompass a suspect's "right to be informed about [a] retained counsel's attempts to contact [him]." *Post* at 548. In support of his view, Judge Shepherd relies on the decisions of three foreign jurisdictions: *People v West,* 81 NY2d 370, 372-374; 599 NYS2d 484; 615 NE2d 968 (1993); *State v Hattaway,* 621 So 2d 796, 801 (La, 1993); and *State v Lefthand,* 488 NW2d 799, 801-802 (Minn, 1992). I believe that all of those cases are inapposite. In *West,* the defendant had an existing attorney-client relationship, and both *Hattaway* and *Lefthand* involved defendants who had court-appointed attorneys. In the present case, on the other hand, the defendant did not have an attorney, did not ask for an attorney, and did not retain an attorney on his own. Counsel was retained by a third party, not by the defendant. I find no reason to turn to foreign jurisdictions in light of our own established case law. The creation of such a novel extension would not advance the development of a sound Michigan constitutional right to counsel.

In summary, I conclude that defendant's second incriminating statement to the police, made while an attorney retained by a third party attempted to contact him, did not violate the privilege against compelled self-incrimination as guaranteed by

Const 1963, art 1, § 17 and protected by the procedural safeguards in *Miranda* or the right to counsel as guaranteed by Const 1963, art 1, § 20. Accordingly, the trial court's refusal to suppress the defendant's second statement should be affirmed.

Finally, I find that the trial court did not err in denying the defendant's request for a separate trial or in admitting the codefendant's statements in a joint bench trial. *People v Etheridge,* 196 Mich App 43, 52-53; 492 NW2d 490 (1992); *People v Butler,* 193 Mich App 63, 66; 483 NW2d 430 (1992). I also conclude that the defendant's concurrent sentences of twenty to forty years' imprisonment for the murder and assault convictions do not violate the principle of proportionality. *People v Milbourn,* 435 Mich 630, 659-660; 461 NW2d 1 (1990).

Affirmed.

GRIBBS, P.J. I concur in the result only.

SHEPHERD, J. *(dissenting).* Defendant appeals from his conviction at a joint bench trial[1] of two counts of second-degree murder, MCL 750.317; MSA 28.549, one count of assault with intent to commit armed robbery, MCL 750.89; MSA 28.284, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). I would reverse, and thus I respectfully dissent from Judge DEEGAN's opinion.

I

The charges against defendant arose out of the deaths of Lorenzo Bundy and Lindsay Jackson. On

---

[1] Two codefendants, Darrell Stubbs and Dwayne Stubbs, were also charged and convicted in connection with this matter at the joint bench trial. Their appeals have been pursued under Docket Nos. 139412 and 139413.

the afternoon before their deaths, Bundy and Jackson left home in their mother's Mustang. Police later found Bundy's body in an alley with his hands tied behind his back and a gunshot wound to the head. Bundy's shirt was pulled up to the shoulders in the back, and his coat was hanging from one arm. Jackson's body was also found in the alley near a dumpster, with two gunshot wounds to the head. Neither Bundy nor Jackson had a wallet or any money when their bodies were found. The Mustang was found in the alley, but no keys were ever recovered.

After defendant was arrested in connection with the matter, he gave two statements to the police. Those statements formed the primary basis for his convictions. The first statement was given to Sergeant James Bivins, while the second statement was given to Lieutenant William Presley.

During the *Walker*[2] hearing, Bivens testified that defendant voluntarily came into the police station, where he was arrested. Bivens testified that defendant was able to read and write, that he did not appear to be under the influence of any chemical substance, and that he conversed coherently. Bivens also testified that defendant was advised of his constitutional rights and signed the standard notification-of-rights form. Further, Bivens testified that no threats or promises were directed toward defendant.

Initially, defendant was only questioned about Bundy's death.[3] In defendant's first statement to the police, he said that he shot Bundy in self-defense after Bundy attempted to rob him. Defen-

[2] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[3] Bivens was only concerned with investigating Bundy's death because Bundy's body was found the day before Jackson's body. Apparently, defendant was not yet a suspect in Jackson's murder.

dant refused to sign this statement. According to Bivens, at no time did defendant indicate that he did not want to talk to the police, or that he wanted to talk to an attorney. Although uncertain about precisely when, Bivens acknowledged that at some point he spoke with defendant's mother, who indicated that she was going to retain an attorney for defendant. It should be emphasized that defendant was eighteen years old when he was arrested and interrogated.

The second officer to speak with defendant was Presley. Presley spoke with defendant the following day. At that point, defendant was questioned in connection with both deaths. According to Presley, defendant had been given breakfast that morning, and he was cooperative. Presley testified that defendant was not threatened or given any promises; and Presley ascertained that defendant was able to read. Presley testified that he advised defendant of his constitutional rights before questioning defendant in the matter, and defendant again signed a notification-of-rights form.

Defendant then gave a statement acknowledging his participation in the crimes; however, defendant said that he only participated because he was coerced by one of the other codefendants to do so. In the initial version of events given by defendant to Presley, defendant stated that he was attacked by one of the decedents, "the tall guy." Then, another individual—"D"—came along and shot defendant's attacker despite defendant's pleas not to shoot him. D then demanded that defendant help him dispose of the body. Meanwhile, the tall guy's brother came along and was grabbed by D. D then told defendant to watch the brother or D would kill defendant. Defendant told the man to lie on the ground while D was away. When D returned, D bound the man's hands. Then, a short

time later, while D forced defendant to help him move the tall guy, the tall guy's brother attempted to run. D demanded that defendant shoot the brother or be shot himself, handing defendant the gun. Defendant shot the tall guy's brother twice.

After making this initial statement, defendant told Presley that he wanted to change the beginning of the story. In the revised version, defendant said that two men—the tall guy and his brother— had approached defendant while they were looking for somebody. Defendant told them that the person was not there, and so they started to leave. However, as they were leaving D approached with a gun and said "this is a stick-up." D took defendant's coat, and ordered defendant to find something with which to tie up the others. D took the keys to the Mustang, and demanded that defendant move the car. At one point, the tall guy attacked defendant with a broom—and that was when D shot the tall guy. D took money and drugs from the tall guy. Defendant stated that the remainder of the events occurred the same way as he had recounted earlier.

Presley testified at the *Walker* hearing that after giving his second statement, defendant initialed all of his answers, and signed each page of the statement. However, defendant later crossed out his signatures. Presley testified that defendant said that he was crossing out his signatures because his mother had told him not to sign anything if she was not there.

Presley then testified that he was in the middle of taking defendant's statement when he was informed by another officer that an attorney for defendant was present at the police station. Presley did not allow the attorney access to defendant, nor did Presley tell defendant that an attorney was immediately available. Rather, Presley contin-

ued to take defendant's statement. Then, shortly after learning of the attorney's presence, Presley asked defendant if he had requested an attorney. According to Presley, defendant wrote down "no" in his own handwriting in response to that question. While it appears that the attorney sought judicial intervention in an attempt to gain access to defendant, that was not until after defendant's statement was completed.

When defendant took the stand at the *Walker* hearing, his version of the events surrounding the interrogation was different from that of the officers. Defendant testified that he crossed out his signatures from the second statement because, after reading it more carefully in Presley's absence, he discovered that Presley had not typed everything that defendant had said. Defendant testified that he was threatened and given promises of leniency in exchange for his statements by officers other than Bivens and Presley. Although defendant acknowledged writing the word "fair" in response to how he had been treated during the second interrogation, he stated that his response only pertained to his treatment by Presley, and not the other officers. Further, defendant testified that he had asked for an attorney during both interrogations. Defendant denied writing "no" in his second statement in response to whether he had requested an attorney. Defendant testified that when he placed his initials on the margin next to the question concerning his request for an attorney, the response line was blank at the time. Further, defendant testified that before he gave his second statement he had been told by his mother that she had called an attorney for him. Defendant testified that he kept asking the police about an attorney because he knew that his mother had called one.

The trial court denied defendant's motion to suppress his statements, finding that the officers were not required to inform defendant that his attorney was present. Following a joint bench trial, defendant was convicted as noted above. Herein defendant appeals as of right.

## II

On appeal, defendant argues that the prosecution did not meet its burden of proving that his statements were given voluntarily and without coercion. Further, defendant argues that the police should not be allowed to benefit from their improper tactics. In addition to the fact that the police did not tell defendant that his attorney was present at the time of interrogation, defendant also alleges that the police deliberately misrepresented to defense counsel the defendant's location when counsel arrived at police headquarters.

On appeal, this Court must review the trial court's determination of voluntariness after examining the entire record, and must make an independent determination under the totality of the circumstances. *People v Brannon,* 194 Mich App 121, 131; 486 NW2d 83 (1992); *People v Wright,* 441 Mich 140, 147; 490 NW2d 351 (1992). However, this Court gives great deference to the trial court's assessment of the credibility of the witnesses, and its findings of fact will not be reversed unless clearly erroneous. *Brannon, supra* at 131.

## III

Turning to the facts of this case, it is readily apparent that the trial court viewed defendant's testimony concerning the interrogation with more skepticism than that of the police officers. The

police officers testified that no threats or promises
were made in obtaining the statements. They also
testified that defendant received breakfast in the
morning before giving his second statement, and
he appeared cooperative. Both officers testified that
defendant seemed competent to understand his
rights, and that he signed a written form notifying
him of his rights to remain silent, against self-
incrimination, and to the assistance of counsel,
among others. Further, both officers testified that
at no point did defendant request the assistance of
counsel. Thus, in these respects, we must defer to
the trial court in its assessment of credibility. *Id.* I
do not believe that the trial court clearly erred in
these findings of fact, which are strongly corrobo-
rated by the testimony of the police officers. *Id.*

Defendant also argues that the police employed
improper tactics by misrepresenting defendant's
whereabouts to defense counsel. However, this
allegation is simply not supported by the record.
While the officers may have refused defense coun-
sel access to defendant, there is no evidence that
they deliberately tried to conceal defendant's loca-
tion. Thus, I would conclude that the police officers
did not do anything to misrepresent defendant's
location to his attorney. *Id.*

However, most importantly, there remains the
question whether the officers' refusal to inform
defendant of his attorney's attempts to contact
him was in some respect improper. On this ques-
tion, I find compelling the analyses of Chief Jus-
tice CAVANAGH and Justice MALLETT in *Wright,*
*supra* at 155 and 142, respectively. While four
justices concurred in reversing this Court's previ-
ous decision in *Wright,*[4] those favoring reversal
gave three separate legal bases for doing so.

---

[4] The Supreme Court's decision reversed this Court's previous opin-
ion, *People v Wright,* 186 Mich App 566; 465 NW2d 339 (1990).

IV

First, on an independent basis, I would suppress defendant's second statement and reverse his convictions under the analysis set forth in Chief Justice CAVANAGH's concurring opinion in *Wright, supra* at 155. That is, I agree that a suspect's right to counsel under Const 1963, art 1, § 20 encompasses the right to be informed about retained counsel's attempts to contact the suspect. *Wright, supra* at 160-161 (CAVANAGH, C.J., concurring).

The facts in *Wright* and the case at bar are strikingly similar. In both cases the defendant was not aware that retained counsel was attempting to contact him during a custodial interrogation. In both cases the police refused the attorney access to the defendant, and refused to inform the defendant that his attorney was attempting to contact him. In both cases the defense attorney sought judicial intervention, but it was to no avail because the defendant's statement was completed in the interim.

I agree with Chief Justice CAVANAGH that "custodial interrogation of an accused who is represented by counsel" is a "critical" prearraignment stage of prosecution triggering our state's constitutional right to counsel. *Wright, supra* at 160 (CAVANAGH, C.J., concurring). The fact that retained counsel has attempted to contact a suspect may influence the suspect's decision whether to consult the advice of counsel. Refusing a suspect access to the information about counsel's attempted contact "render[s] subsequent statements by the suspect inadmissible as taken in derogation of the right to counsel." *Wright, supra* at 164 (CAVANAGH, C.J., concurring).

While this expanded scope of the right to counsel under Const 1963, art 1, § 20 is fairly novel to

Michigan jurisprudence, a number of other jurisdictions also have recently commented on the scope of their state's constitutional right to counsel.[5] Of particular relevance to the case at bar, in *People v West,* 81 NY2d 370, 373-374; 599 NYS2d 484; 615 NE2d 968 (1993), the Court of Appeals of New York concluded that New York's right to counsel attached when the accused retained counsel:

> [T]he right to counsel attaches indelibly where an uncharged individual has actually retained a lawyer in the matter at issue or, while in custody, has requested a lawyer in that matter.

The Court of Appeals of New York in *West* further expounded on the right to counsel as follows:

> The right to counsel helps to equalize the balance and assure that any waiver is knowing and intelligent. . . . Additionally, the right protects against undue interference with any existing attorney-client relationship. [*Id.* at 374.]

In *West,* retained counsel previously had been present at the defendant's lineup, and counsel instructed the police not to question the defendant. Thus, while there is some distinction between the case at bar where counsel had not yet had any contact with defendant, I would also emphasize that the defendant in the case at bar was only eighteen years old. It would not be unreasonable to conclude that defendant had an expectation that his family would make arrangements for retained counsel. The record is unclear regarding whether defendant actually knew that his mother had secured counsel for him. However, regardless

---

[5] See, e.g., *State v Hattaway,* 621 So 2d 796, 801 (La, 1993); *State v Lefthand,* 488 NW2d 799, 801-802 (Minn, 1992).

of precisely who arranged for counsel, the most compelling fact remains that the very police officers who were interrogating the defendant knew that defendant's retained counsel was immediately available at the station and wanted to speak with defendant—and the police continued the interrogation without informing defendant of retained counsel's availability.

At this juncture, I would make the observation that Judge DEEGAN's analysis seems dependent upon his statement that "[c]ounsel was retained by a third party, not by the defendant." *Ante* at 540. I believe that this is a distinction without meaning. In response, I would emphasize that the "third party" in this case was defendant's mother, and that defendant was only eighteen years old at the time of interrogation. Notably, although uncertain about the precise timing, Sgt. Bivens acknowledged that at some point he had spoken with defendant's mother, who indicated that she was going to retain an attorney for defendant. As it turns out, defendant's mother did in fact hire the attorney. This theme of defendant's dependency upon his family for guidance in this matter was repeated in other testimony. Lt. Presley testified that defendant said that he was crossing out his signature from the second statement because his mother had told him not to sign anything if she was not there. Under these circumstances, I would conclude that defendant was unfairly denied knowledge of *his* retained counsel's attempts to contact him.

I would concur with Chief Justice CAVANAGH's reasoning in *Wright, supra* at 155. On this basis alone I would suppress defendant's second statement to police and reverse his convictions.

V

I would also suppress defendant's second state-

ment to the police and reverse his convictions under the analysis set forth by Justice MALLETT in *Wright, supra* at 142. That is, while a suspect's Fifth Amendment right against self-incrimination does not require police to disclose counsel's attempts to contact the suspect, *Moran v Burbine*, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), the Michigan counterpart, Const 1963, art 1, § 17, may and should be extended to so require it. *Wright, supra* at 154. As noted by Justice MALLETT, a number of other jurisdictions have recognized that "it is necessary for a suspect to be informed of an attorney's attempted contacts." *Wright, supra* at 148. To update the list of cases from other jurisdictions, I would cite one additional, recent case from the Supreme Court of New Jersey, *State v Reed*, 133 NJ 237; 627 A2d 630 (1993).

*Reed* involved facts similar to those in the case at bar. Therein, a defendant was denied access to information that counsel retained by his family was immediately available at the time of interrogation. *Id.* at 243. The Supreme Court of New Jersey made the following enlightening comments, *id.* at 253, 255-256, 257:

> Our decisional law on the state right against self-incrimination is based on the understanding that the privilege is defined by the ancillary rights, like the right to counsel during custodial interrogation. Moreover, the protections afforded by those ancillary rights provide a metric by which to measure the strength of the privilege. . . .
>
> *   *   *
>
> [W]hile courts may differ on the rationale for imposing the duty to inform a suspect that an

attorney is waiting to confer, they agree on one supervening principle: the atmosphere of custodial interrogation is inherently coercive and protecting the right against self-incrimination entails counteracting that coercion. Thus, although "knowledge" is always a relevant factor in assessing the validity of a waiver of the right against self-incrimination, because the right is against *compelled* self-incrimination, "knowledge" can be best understood as a condition of "voluntariness," which itself denotes the absence of "compulsion." Consequently, standards ostensibly imposed to enhance a suspect's "knowledge" of the *Miranda* rights also counteract coercion and assure "voluntariness." Some courts have recognized that connection. . . .

\* \* \*

Accordingly, the most practical means to overcome coercion will be through normative rules that apply reasonable, specific, and objective standards. Although we cannot conclude with confidence that a suspect's knowledge that an attorney is ready, able, and willing to represent him or her will enhance the suspect's knowledge of the right to counsel, that knowledge will surely play an important role in "dissipat[ing] the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's" right against self-incrimination. . . .

[W]e believe that requiring the police to inform the suspect of an attorney's presence will greatly reduce the temptation, on law enforcement authorities, to pressure the suspect into a confession before the attorney gains access to the suspect. [Emphasis in original.]

I find the principles enunciated in *Reed* compelling, and in accord with Justice MALLETT's opinion in *Wright.* As in *Wright,* it cannot be said here that defendant knowingly and voluntarily waived his right against self-incrimination under Const 1963, art 1, § 17 without access to the information that retained counsel was available and was at-

tempting to contact him. I find the majority's analysis particularly troublesome given defendant's young age, and his dependency upon his family for assistance. Thus, I would also suppress defendant's second statement and reverse his convictions on this basis.

## VI

Finally, in light of the split of opinion over the applicable legal principles discussed in *Wright, supra,* a brief discussion of Justice BRICKLEY's concurring opinion also seems appropriate. Justice BRICKLEY seems to focus on the question whether the defendant's waiver of the right to remain silent was truly voluntary under the totality of the circumstances. *Wright, supra* at 172 (BRICKLEY, J., concurring). Apparently, Justice BRICKLEY would analyze the police conduct here for its overall coercive nature, and would regard the denial of information about an attorney's attempted contacts as only one factor in that analysis. Because the present case does not involve any "coercive" activity by the police other than the denial of information about defendant's retained counsel, it is unclear how Justice BRICKLEY would rule in this case. *Wright* certainly seemed to involve greater overall coercion, with the deprivation "of food, sleep, and contact with friendly outsiders." *Wright, supra* at 172 (BRICKLEY, J., concurring).

I disagree with the implication in Justice BRICKLEY's opinion in *Wright* that suppression is only warranted in cases of extreme coercion. I believe that the right to counsel—either under Const 1963, art 1, § 20 or as an element of the right against self-incrimination under Const 1963, art 1, § 17—is so fundamental that a finding of extreme coercion is not necessary where a defendant is

deprived of information about retained counsel's availability and attempted contacts during a custodial interrogation.

In summary, I would reverse defendant's convictions for the reasons discussed in parts IV and V, *supra.* I respectfully dissent from Judge DEEGAN's opinion and would remand for a new trial at which the second statement would be excluded.