PEOPLE v BENDER

Docket No. 162477. Submitted February 17, 1994, at Lansing. Decided December 29, 1994, at 9:20 A.M.

Jamieson T. Bender and Scott A. Zeigler were each charged in the Oakland Circuit Court with three counts of breaking and entering. The court, John N. O'Brien, J., suppressed evidence of the defendants' postarrest statements to the police because the police failed to inform the defendants before taking their statements that counsel retained for each of them had attempted to contact them. The prosecution appealed by leave granted.

The Court of Appeals *held:*

1. Although the trial court failed to make specific factual findings regarding the voluntariness of the defendants' statements, the record supports the trial court's finding that, under the totality of the circumstances, the statements were made freely and voluntarily.

2. The right against compelled self-incrimination, as protected by Const 1963, art 1, § 17, includes the right to remain silent and the right to be represented by an attorney. Waiver of these rights must be knowing, intelligent, and voluntary. A suspect's knowledge of the presence of retained counsel is relevant to the voluntariness of a waiver. Failure by the police to inform a suspect of the presence of retained counsel and attempts by counsel to contact the suspect renders any subsequent waiver of the right to remain silent and the right to counsel unknowing, unintelligent, and involuntary.

Affirmed.

CRIMINAL LAW — RIGHT AGAINST SELF-INCRIMINATION — RIGHT TO COUNSEL.

The right against compelled self-incrimination includes the right

REFERENCES

Am Jur 2d, Criminal Law §§ 703, 710, 737, 759, 761, 937, 941, 970, 989, 990.

Scope and extent, and remedy or sanctions for infringement, of accused's right to communicate with his attorney. 5 ALR3d 1360.

Denial of, or interference with, accused's right to have attorney initially contact accused. 18 ALR4th 669.

to be informed by the police of attempted contacts by retained counsel; failure by the police to so inform a suspect renders invalid any subsequent waiver of the right to remain silent and the right to counsel (Const 1963, art 1, § 17).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, *Michael J. Modelski,* Chief, Appellate Division, and *Mary M. Stiel,* Assistant Prosecuting Attorney, for the people.

*Condit, McGarry & Schloff, P.C.* (by *Alexander B. McGarry*), for Jamieson T. Bender.

*Benjamin & Goldfine* (by *Allan Z. Goldfine*), for Scott A. Zeigler.

Before: WEAVER, P.J., and JANSEN and E. SOS-NICK,* JJ.

JANSEN, J. The people appeal by leave granted from a March 1, 1993, order of the Oakland Circuit Court suppressing defendants' postarrest statements. We affirm.

I

Following a preliminary examination in September 1991, defendants were bound over to the circuit court for trial on three counts of breaking and entering a building, MCL 750.110; MSA 28.305. Defendants moved to have their postarrest statements made to Bloomfield Township police suppressed on the grounds that the statements were involuntary and were taken in violation of their right to counsel. Following an evidentiary hearing, the trial court found that the statements had been voluntarily made, but that the statements must be

---

* Circuit judge, sitting on the Court of Appeals by assignment.

suppressed because defendants had not been apprised that their parents had retained attorneys for them and that the attorneys had contacted the police station before defendants waived their right to counsel. The people appeal by leave granted. We affirm the trial court's decision, but for further reasons as explained below.

The facts of this case are taken from the evidentiary hearing held on three separate days. The incident in question occurred during the early morning hours of August 2, 1991. Both defendants had been drinking beer during the evening and they allegedly had taken bicycles from two separate residences and removed a sink from a house that was under construction. Bloomfield Township Police Officer Steven Currie was dispatched at 3:29 A.M. and arrived at the scene of one of the breaking and enterings at 3:33 A.M. Shortly thereafter, a canine unit arrived and defendant Bender was apprehended by a canine handler. Bender was arrested at approximately 4:00 A.M. and was placed in a holding cell at approximately 4:30 A.M.

Sometime between 6:30 A.M. and 7:30 A.M., Currie and Sergeant DeWolfe went to defendant Zeigler's house. Zeigler allowed the officers into the house. Zeigler told the officers that he had loaned his car to Bender, that he knew where his car was located, that he and Bender had taken a couple of bicycles, and that they had taken a sink from a house that was under construction. After Zeigler agreed to show (and did show) Currie where the bicycles and sink were, Zeigler was arrested.

Currie stated that he took Zeigler into custody at approximately 8:00 A.M. or 8:30 A.M. However, Zeigler's mother, Ruth, who was at the house at the time that Zeigler was arrested, stated that she had called attorney Allan Goldfine at 6:45 A.M. Goldfine had told her to go to the police station

and tell Zeigler not to talk to anyone until he first
talked to Goldfine. She went to the police station
at 7:15 A.M., talked to Currie, and asked to see
Zeigler. She also told Currie that she had a mes-
sage for Zeigler from their lawyer. Currie, how-
ever, told Ruth that she could not see her son, that
she could not get a message to him, and that she
could not stay and talk to the detective. Currie
recalled that he spoke to an older woman in the
station and that she identified herself as one of the
defendants' mothers. Currie stated that she
wanted to see her son, but he told her that he was
with the detectives and she could see them when
they were finished.

Bender's mother, Kathleen, was called by a
police officer concerning Bender's arrest at about
5:30 A.M. She then contacted Bender's father, Phil-
lip, who was residing in Iowa at the time. Phillip
called the police station at 7:00 A.M. and asked to
speak with his son. Phillip told the police officer
that he was going to get counsel for his son
immediately. Phillip called attorney Elizabeth Pez-
zetti after speaking with the police officer. Pezzetti
agreed to represent Bender.

Pezzetti called the police station at approxi-
mately 9:00 A.M. and asked to speak with Bender
and the detective in charge as soon as possible.
The officer who answered the telephone told Pez-
zetti that Bender's paperwork had not yet come
up, that Bender was being held, and that she
would let the detective know that Pezzetti wished
to speak with the detective and Bender. Pezzetti
again called the station at 10:00 A.M. because her
call was not returned. It was not until 11:00 or
11:30 A.M. that Detective Ronald Genereaux called
Pezzetti. Genereaux stated that he had talked to
both defendants, that the defendants had been
cooperative, and that the defendants would be

released without bond to their parents. Pezzetti stated that had she been given the opportunity to speak to Bender, she would have told him not to talk to anyone and that she would be at the station.

Genereaux was the interrogating officer. Zeigler was interrogated first. Zeigler signed his *Miranda*[1] warnings form and read it aloud at 9:08 A.M. Zeigler gave his statement, and the interview lasted about thirty to forty minutes. Bender was interviewed at 9:50 A.M. and likewise signed his *Miranda* warnings form and read it aloud. Bender's statement also lasted between thirty and forty minutes.

It is undisputed that Bender was never informed by the police that Pezzetti had attempted to call him and had been retained for him. It is also undisputed that Zeigler's mother was not permitted to see her son and that no message was given to Zeigler that she had retained an attorney for him. Both defendants stated that they understood the *Miranda* warnings form, and neither requested counsel before or during the interviews.

Both defendants testified regarding their statements. Zeigler was twenty years old, had no prior contacts with the police, and was attending Eastern Michigan University and Schoolcraft College to become a teacher. He had been drinking beer that night, but Genereaux stated that he showed no signs of intoxication. Zeigler stated that no one offered him the opportunity to make a telephone call and he did not ask if he could make a call. He was not offered food or water, and he had been awake continuously for approximately twenty-six hours. He was not told that there was a message for him from his attorney. Zeigler did state that he

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

understood his *Miranda* rights form and he understood that if he wanted an attorney, one could have been retained or appointed for him.

Bender was also twenty years old and had no prior contacts with the police. He was attending the University of Michigan-Dearborn. He had also been drinking that night. Bender was not given food or water and had not slept for about twenty-five hours. Bender was told, when he was being fingerprinted, that he could make a telephone call later, but he never made a telephone call. Bender understood the *Miranda* rights form when he read it, but he was unsure if he had to remain in a holding cell if he requested an attorney. Bender was never informed that an attorney had attempted to contact him at the police station.

On the basis of this evidence, the trial court ruled that the conduct of the police had not been reprehensible and that each defendant had made a voluntary statement with full knowledge of his *Miranda* rights. However, the trial court ruled that the post-arrest statements had to be suppressed because the defendants were not informed that counsel had been retained for them before the statements were given and that the statements were, therefore, made without a knowing waiver of the right to counsel. The trial court made this ruling on the basis of *People v Wright,* 441 Mich 140; 490 NW2d 351 (1992).

II

The people first argue that the statements were voluntarily made. The issue of voluntariness is a question of law for the court's determination. *People v Walker (On Rehearing),* 374 Mich 331, 338; 132 NW2d 87 (1965). The prosecution has the burden of proving voluntariness by a preponder-

ance of the evidence. *People v Etheridge,* 196 Mich App 43, 57; 492 NW2d 490 (1992). In reviewing the trial court's findings, this Court examines the entire record and makes an independent determination of voluntariness. However, this Court gives deference to the trial court's superior ability to judge the credibility of the witnesses, and will not reverse the trial court's factual findings unless they are clearly erroneous. *Id.*

This issue merits little consideration because the trial court ruled that defendants made voluntary statements with full knowledge of their *Miranda* rights. Although the trial court failed to make specific factual findings regarding voluntariness, the record supports the trial court's finding that, under the totality of the circumstances, the statements were made freely and voluntarily. *People v Cipriano,* 431 Mich 315, 334; 429 NW2d 781 (1988).

III

A

The real issue facing us is whether the trial court erred in finding that defendants did not knowingly waive their right to counsel because they were not informed by the police that attorneys had been retained for them and the attorneys had contacted the police before they gave their statements. We conclude that the trial court did not err in so ruling.

This case implicates the rights afforded by the Fifth Amendment to the United States Constitution and by Const 1963, art 1, § 17. A defendant's rights under these provisions include the right to remain silent and the right to be represented by an attorney. However, a defendant may waive these rights provided that the waiver is made voluntarily, knowingly, and intelligently. *Miranda*

*v Arizona,* 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). It is clear that the trial court's ruling would have been in error under federal law. The United States Supreme Court has held that a defendant's knowledge of the presence of an attorney retained for the defendant is irrelevant to the voluntariness of the waiver of the right to counsel under the Fifth Amendment. *Moran v Burbine,* 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986).

The question whether a defendant can knowingly and voluntarily waive his right to counsel, as guaranteed by the Michigan Constitution, without the knowledge that an attorney has been retained for him and is attempting to contact him has not been definitively decided. In *Wright,* four justices concurred in suppressing the defendant's statement, but gave three separate legal bases for doing so. Thus, the plurality decision in *Wright* is not an authoritative interpretation under the doctrine of stare decisis. *Negri v Slotkin,* 397 Mich 105, 109-110; 244 NW2d 98 (1976).

Recently, this Court, GRIBBS, P.J., and SHEPHERD and P. E. DEEGAN, JJ., considered the issue in *People v Brown,* 206 Mich App 535; 522 NW2d 888 (1994). Judge DEEGAN ruled that the police officers' failure to inform the defendant of an attorney's attempts to contact him did not violate the privilege against compelled self-incrimination as guaranteed by Const 1963, art 1, § 17. However, *Brown* is not binding pursuant to Administrative Order No. 1994-4 because Judge GRIBBS concurred with Judge DEEGAN in result only and Judge SHEPHERD dissented. Administrative Order 1994-4 makes binding upon this Court "the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990." *Brown* is not binding because a majority of judges reached a decision but did not agree on the under-

lying reasoning, and no point of law is established by the decision. *Fogarty v Dep't of Transportation,* 200 Mich App 572, 574-575; 504 NW2d 710 (1993).

We agree with the analyses employed by Justice MALLETT in *Wright* and Judge SHEPHERD in *Brown* and we adopt those analyses in this case. Therefore, we hold that Const 1963, art 1, § 17 may and should be extended to require the police to disclose counsel's attempts to contact the suspect. See *Wright, supra,* p 154; *Brown, supra,* p 551 (SHEPHERD, J., dissenting). The failure of the police to notify defendants of counsel's attempts to contact defendants rendered defendant's waiver of their *Miranda* rights unknowing and involuntary, and the statements were, therefore, properly suppressed by the trial court.

B

A number of other jurisdictions have also recognized that it is necessary for a suspect to be informed of an attorney's attempted contacts. *State v Haynes,* 288 Or 59; 602 P2d 272 (1979); *Wisconsin v Middleton,* 135 Wis App 2d 297; 399 NW2d 917 (1986); *Haliburton v State,* 514 So 2d 1088 (Fla, 1987); *Roeder v State,* 768 SW2d 745 (Tex App, 1988); *State v Stoddard,* 206 Conn 157; 537 A2d 446 (1988); *Bryan v Delaware,* 571 A2d 170 (Del, 1990); *People v McCauley,* 228 Ill App 3d; 595 NE2d 583 (1992); *State v Reed,* 133 NJ 237; 627 A2d 630 (1993). "[S]tates are free to adopt more protective standards under state law." *Wright, supra,* p 154.

As Justice MALLETT stressed, it is crucial that a defendant make a knowing, intelligent, as well as a voluntary, choice regarding the waiver of counsel. *Wright, supra,* p 151. Thus, the "critical inquiry is whether the information withheld by the

police would have changed the defendant's appraisal and understanding of the circumstances of the waiver." *Id.* Contrary to Judge DEEGAN's assertion that requiring the police to inform the suspect of an attorney's attempted contact "would create in Michigan a Gordian knot concerning *Miranda* rights," *Brown, supra,* p 539, the courts would focus on this "critical inquiry" and look to other relevant factors such as the relationship between the attorney and the defendant, the nature of counsel's request, the conduct of the suspect, and the extent to which the police had reasonable notice of counsel's request. *Wright, supra,* pp 151-152.

IV

Applying those factors to this case, we find that defendant Bender's father, Phillip, telephoned the police station at approximately 7:00 A.M. and informed an officer that he was going to retain an attorney for his son. Phillip then telephoned attorney Elizabeth Pezzetti and she agreed to represent Bender. Pezzetti telephoned the police station at approximately 9:00 A.M. and said that she wished to speak with Bender and the detective in charge. Her telephone call was not returned and she did not speak with Bender. She again called the police station at 10:00 A.M. and asked to speak with Bender and the detective in charge, but she was only told that the detective would call her back. It was not until 11:00 or 11:30 A.M. that Genereaux called Pezzetti. This was well after the completion of the interrogation, which began at 9:50 A.M. Therefore, the police had ample notice that an attorney had been retained for Bender and the attorney had specifically asked to speak with the suspect.

Additionally, Bender stated that he requested to make a telephone call when he was being fingerprinted and that the request was denied and he was told that he could make a call later. It is undisputed that Bender was never informed by the police that an attorney had been retained for him and that the attorney had attempted to contact him at the police station. Bender testified that had Pezzetti contacted him, he would have followed her advice. Thus, under Justice MALLETT's analysis, had Bender been informed that an attorney had been retained for him and attempted to contact him, he would not have waived his right to counsel or the right to remain silent. *Wright, supra,* pp 153-154.

Regarding Zeigler, his mother, Ruth, called attorney Allan Goldfine at approximately 6:45 A.M., shortly after Zeigler was taken by the police. Goldfine told Ruth to go to the station and tell Zeigler not to speak with anyone until he first spoke with Goldfine. Ruth went to the police station at 7:15 A.M. and spoke with Officer Currie. She asked to see Zeigler and she told Currie that she had a message for Zeigler from his attorney. Currie told Ruth that she could not see Zeigler, that she could not get a message to him, and that she could not stay at the station and talk to the detective. Thus, the police had adequate notice of the fact that an attorney had been retained for Zeigler and that there had been a message for Zeigler from the attorney.

It is undisputed that the police did not inform Zeigler that an attorney had been retained for him and that his mother had been at the station with a message for him. Zeigler testified that had he received his attorney's message, he would have heeded it. Under these circumstances, we must again conclude that had Zeigler been informed

that an attorney had been retained for him and had a message for him, he would not have waived his right to counsel or the right to remain silent. *Id.*

V

Accordingly, we extend the rights afforded under Const 1963, art 1, § 17 to include information of retained counsel's efforts to contact a suspect. We believe that such a protection is necessary to allow suspects in custody to make a knowing, intelligent, and voluntary waiver of their right to counsel and right to remain silent. Therefore, the trial court did not err in suppressing defendants' postarrest statements where the police failed to inform them that counsel had been retained and of counsel's attempts to contact them.

Affirmed.

WEAVER, P.J., did not participate.