PEOPLE v YOUNG

Docket No. 155964. Submitted April 12, 1995, at Detroit. Decided
August 15, 1995, at 9:15 A.M. Leave to appeal sought.

Bryce W. Young was convicted following a bench trial in the
Recorder's Court for the City of Detroit, Wendy M. Baxter, J.,
of second-degree murder and possession of a firearm during the
commission of a felony. He was sentenced to twelve to thirty
years' and two years' imprisonment for the respective convic-
tions. The defendant appealed.

The Court of Appeals *held:*

1. The trial court did not err in determining that the state-
ments given by the defendant to the police were voluntary.

2. The defendant's rights under the Fifth Amendment of the
United States Constitution were not violated when the police
failed to inform the defendant that his family had retained
counsel for him and that counsel had attempted to contact the
defendant and the police did not interrupt the interrogation
process to facilitate the defendant's consultation with counsel.

3. A panel of the Court of Appeals that is obligated under
Administrative Order No. 1994-4 to follow two conflicting opin-
ions of the Court of Appeals published after November 1, 1990,
must follow the first opinion that was published.

4. The totality of the circumstances test is the proper test to
determine whether the defendant's confession was voluntary.
Application of the test here indicates the confession was volun-
tary and was properly considered.

5. The remaining contentions of error are without merit.
Affirmed.

WAHLS, J., dissenting, stated that the circumstances here,
incommunicado interrogation and the deprivation of food and
sleep, rendered the defendant's statements involuntary. The
defendant's convictions should be reversed and the matter
should be remanded for a new trial.

1. APPEAL — STARE DECISIS — CONFLICTING OPINIONS.

A panel of the Court of Appeals must follow the rule of law

REFERENCES

Am Jur 2d, Courts § 201; Evidence § 719.
See ALR Index under Confessions and Admissions; Precedents.

established by a prior published decision of the Court issued on
or after November 1, 1990; where two conflicting opinions are
published after November 1, 1990, the panel must follow the
first opinion (Administrative Order No. 1994-4).

2. CRIMINAL LAW — EVIDENCE — CONFESSIONS — VOLUNTARINESS.
  A trial court should consider the totality of the circumstances in
  determining whether a defendant's statements to the police
  were knowing, voluntary, and admissible.

*Frank J. Kelley,* Attorney General, *Thomas L.
Casey,* Solicitor General, *John D. O'Hair,* Prosecut-
ing Attorney, *Timothy A. Baughman,* Chief of
Research, Training, and Appeals, and *Jeffrey Ca-
minsky,* Assistant Prosecuting Attorney, for the
people.

State Appellate Defender (by *F. Michael
Schuck*), for the defendant on appeal.

Before: O'CONNELL, P.J., and WAHLS and N. O.
HOLOWKA,* JJ.

O'CONNELL, P.J. Defendant appeals as of right
his bench trial convictions of second-degree mur-
der, MCL 750.317; MSA 28.549, and possession of a
firearm during the commission of a felony, MCL
750.227b; MSA 28.424(2). He was sentenced to
twelve to thirty years' and two years' imprison-
ment, respectively. We affirm.

On September 7, 1991, at the corner of Balfour
and Haverhill Streets in the City of Detroit, James
Curenton (also referred to as James Cureton) was
shot to death by a masked gunman. Dondrea
Smith, a witness to the shooting, later testified
that, immediately before the incident, she saw a
man wearing a ski mask and jogging pants emerge
from a nearby alley carrying a gun. The gunman
began shooting, whereupon Smith and her friends

---

* Circuit judge, sitting on the Court of Appeals by assignment.

scattered. However, Smith testified that she saw
the gunman chase Curenton, throw him to the
ground, and take his jewelry before running away.

Initially, Smith was unable to identify defini-
tively the gunman because of the ski mask and the
twilight conditions. Indeed, Smith and her associ-
ates at first believed that a person named Deray
Dixon had committed the shooting, and they began
to lay plans to retaliate. The conspiracy was aban-
doned, however, when the group acknowledged
that none of them could, with confidence, identify
Dixon as the shooter.

Smith's identification of defendant as the gun-
man is based on a conversation she had with
defendant at the Wayne County Jail during which
defendant admitted shooting the decedent. This
was the only testimony beyond defendant's subse-
quent statement to the police that unmistakably
linked defendant to the crime. Other witnesses,
such as Joseph Broom, could identify the gunman
only as a light-skinned African-American. Broom,
however, familiar with defendant's voice, also
identified defendant as the perpetrator on the
basis of words spoken by the gunman at the time
of the incident.

The officer in charge of the case, Sergeant Lee
Caudill of the Detroit Police Department, took a
statement from defendant at approximately 6:40
P.M. on September 10, 1991. Defendant admitted
that, at the time Curenton was fatally shot, defen-
dant was wearing a gray jogging sweater, red
jogging pants, gray Adidas sneakers, and a black
ski mask. Defendant told Sergeant Caudill that he
had planned to scare Curenton because Curenton
owed him $300 and had refused to repay it. Defen-
dant was carrying a sawed-off rifle when he ap-
proached Curenton from an alleyway near the
intersection. Defendant claimed that Curenton

shot at defendant and defendant returned fire, then ran and threw his gun into the alley before going home. Defendant maintained that he took nothing from Curenton.

Defendant also presented an alibi defense, one inconsistent with his prior statement to Sergeant Caudill. Siddiqa Bobo testified that defendant had been at her house on the night in question from 7:40 P.M. until 9:03 P.M. The shooting occurred between 8:30 P.M. and 9:00 P.M.

On appeal, defendant presents a panoply of issues to this Court. He first contends that his statements to Sergeant Caudill were not voluntarily made, and, therefore, should have been held to be inadmissible. Defendant was arrested on the evening of September 9, 1991, and placed in a holding cell for the night. It was later determined that defendant had last eaten a meal at approximately 3:00 P.M. on the afternoon of September 9, and that he was not fed at the jail on either September 9 or on the morning of September 10. Defendant also did not sleep well on September 9 because the holding cell had no bed.

On the morning of September 10, defendant was questioned by Sergeant Caudill beginning at 9:20 A.M. for approximately one hour. Defendant signed a waiver at the outset of this interview and initially denied all involvement in the killing of Curenton.

At approximately noon, defendant requested food and was given a soft drink and snack cake. At 2:00 P.M., defendant was taken to the police crime laboratory for the administration of a polygraph examination. While the examination was being conducted, Sergeant Caudill received a telephone call indicating that defendant's family had retained an attorney who was at the police station requesting an opportunity to meet his client. De-

fendant was not notified of this fact and the polygraph examination continued.

At the conclusion of the examination, defendant was questioned by Sergeant Caudill, who believed defendant to be lying. This questioning lasted approximately forty minutes, following which defendant made the previously noted admissions concerning his presence at the scene, his attire (which corresponded to the description given by witnesses), and the fact that he had armed himself, sought out Curenton, and fired his weapon at Curenton. After defendant's statement was reduced to writing, defendant refused to sign it without consulting an attorney.

Defendant raised the issue of the voluntariness of his statement before the trial court, which, after reviewing a videotape of the entire interview between Sergeant Caudill and defendant, concluded that, under the totality of the circumstances, defendant's statement was voluntary. The court further found that the failure to inform defendant that an attorney had attempted to contact him did not render his statement involuntary. Accordingly, defendant's motion to suppress was denied.

Our review of the issue of voluntariness is required to be independent of that of the trial court. *People v Robinson*, 386 Mich 551, 558; 194 NW2d 709 (1972). However, to the extent that resolution of the disputed factual questions turns on the credibility of witnesses or the weight of the evidence, this Court will ordinarily defer to the trial court, which has a superior opportunity to evaluate these matters. *People v Marshall*, 204 Mich App 584; 517 NW2d 554 (1994).

In the present case, while defendant had little in the way of sustenance and was faced with unsatisfactory sleeping accommodations, we deem the trial court's finding of voluntariness to be correct,

and affirm it. *People v Cipriano,* 431 Mich 315, 334; 429 NW2d 781 (1988). Defendant's failure to eat after 3:00 P.M. on the day of his arrest is, in large part, attributable to defendant's own eating habits, since he was not arrested until some time after 9:00 P.M. that evening. While he was not provided breakfast, he was given a snack and drink the first and only time he complained about being hungry. With respect to defendant's poor sleep the night before the polygraph examination, this may be as much attributable to natural apprehension as to the quality of the accommodations. It would seem far stranger had defendant claimed to have enjoyed a restful night of sleep given that he was confined to a police holding cell under suspicion of murder. In any event, nothing in the record suggests that defendant's ultimate admissions were the product of deliberate sleep deprivation or intentional police attrition.

The totality of the circumstances suggests, rather, that defendant attempted to falsely deny involvement in the crime, and voluntarily submitted to a polygraph examination as a means of lending credibility to his exculpations. When confronted with suggestions that his performance was unconvincing, he opted to confess, despite full knowledge of his constitutional rights, rather than speak with an attorney. In short, we agree with the trial court's finding that defendant's statements were voluntary. *Cipriano, supra.*

Defendant, however, further contends that, because his family had retained counsel, which counsel had attempted to contact defendant, the failure of the police to inform defendant of the attempted communication of the attorney or to interrupt the interrogation process to facilitate defendant's consultation with counsel, violated his right against self-incrimination. In this regard, defendant's

rights under the Fifth Amendment of the United States Constitution were plainly not violated. *Moran v Burbine,* 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986).

The argument is made, however, that Const 1963, art 1, § 17 imposes such requirements independently of the federal constitution. Precisely that issue came before the Michigan Supreme Court in *People v Wright,* 441 Mich 140; 490 NW2d 351 (1992), under facts remarkably similar to those of the present case. However, although four of the seven justices participating in the *Wright* decision concurred in suppressing the defendant's statement, there was no majority opinion. Three separate legal bases were proffered for the result obtained. Thus, under familiar principles, the *Wright* decision did not produce an opinion binding under the doctrine of stare decisis. *People v Jackson,* 390 Mich 621; 212 NW2d 918 (1973); *In re Curzenski's Estate,* 384 Mich 334; 183 NW2d 220 (1971).

Justice MALLETT's opinion in *Wright* would have created a rule per se requiring the police to disclose a retained attorney's attempts to contact a suspect. The failure of the police to provide such notification would render a subsequent statement inadmissible as an unknowing and, hence, involuntary, waiver of *Miranda*[1] rights. Significantly, in broadly construing Const 1963, art 1, § 17, Justice MALLETT was joined only by Justice LEVIN, with Chief Justice CAVANAGH, in his concurring opinion, expressing agreement "with it as far as it goes." *Wright, supra,* pp 155-156. Three of seven justices adopted Justice MALLETT's reasoning.

After *Wright,* a panel of this Court in *People v Brown,* 206 Mich App 535; 522 NW2d 888 (1994),

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

ruled that the failure of police officers to inform an arrestee of an attorney's attempts to contact him did not violate the privilege against self-incrimination guaranteed by Const 1963, art 1, § 17. *Brown,* however, was without precedential value with respect to other panels of this Court pursuant to Supreme Court Administrative Order No. 1994-4 because the lead opinion of *Brown* was signed by only one judge, with one judge concurring in the result only and one judge dissenting. See *Fogarty v Dep't of Transportation,* 200 Mich App 572, 574-575; 504 NW2d 710 (1993).

A month later, this Court was again faced with a similar situation in *People v Armstrong,* 207 Mich App 211; 523 NW2d 878 (1994). In *Armstrong,* the trial court interpreted *Wright* as requiring the suppression of statements obtained from a defendant where the defendant had not been informed that an attorney had attempted to contact him, that is, the trial court applied the analysis of Justice MALLETT, discussed above. This Court reversed, holding that Justice MALLETT's opinion in *Wright* could not be considered to be binding precedent where a majority of the Supreme Court justices rejected the reasoning therein contained.[2] The *Armstrong* panel then

---

[2] Although the panel in *Armstrong* construed Chief Justice CAVANAGH's opinion as rejecting Justice MALLETT's approach, we believe this to be incorrect. Chief Justice CAVANAGH stated:

I believe that [Justice MALLETT's] analytical approach . . . is entirely supportable, and I agree with it as far as it goes. I write separately, however, to express my view that my colleague's conclusion is even more clearly supported on the ground that the police conduct in this case violated the defendant's right to counsel under Const 1963, art 1, § 20. [*Wright, supra,* pp 155-156.]

Clearly, the language employed indicates that Chief Justice CAVANAGH considered both Const 1963, art 1, § 17 and § 20 to be legitimate, independent grounds for suppressing the statements then in issue.

went on to recognize that the totality of the circumstances test first annunciated in *Cipriano, supra,* remained the law in Michigan. Significantly, *Armstrong* inarguably constituted binding precedent pursuant to Administrative Order No. 1994-4.

Eighty-six days after the *Armstrong* decision, a panel of this Court issued its opinion in *People v Bender,* 208 Mich App 221; 527 NW2d 66 (1994). *Bender* involved a factual situation similar to that of *Wright, Brown, Armstrong,* and the present case. The *Bender* panel explicitly held that *Brown* did not constitute binding authority and went on to adopt the reasoning of Justice MALLETT in *Wright,* who, to reiterate, would have held that art 1, § 17 requires the police to disclose counsel's attempts to contact a suspect.

Unfortunately, the *Bender* panel, in rejecting *Brown* and adopting Justice MALLETT's opinion in *Wright,* was, apparently, unaware of this Court's decision in *Armstrong,* and did not address it.[3] This oversight leaves this Court in a quandary. We have two cases that explicitly conflict with each other—*Armstrong* rejecting the reasoning of Justice MALLETT, *Bender* embracing it—and both, at first glance, appear to be binding precedent under Administrative Order No. 1994-4. Obviously, we cannot follow both. Neither Administrative Order No. 1994-4 nor any published opinion of this Court or the Supreme Court addresses this dilemma.

Administrative Order No. 1994-4 provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990," unless a special panel of this

---

[3] In defense of the *Bender* panel, it is likely that the *Bender* opinion was written before the issuance of *Armstrong.* Because of the delays inherent to our internal procedures concerning circulation of proposed opinions, three-month delays between the initial submission of an opinion and its publication are not uncommon.

Court is convened pursuant to the administrative order, or the Supreme Court reverses or modifies such opinion. Before Administrative Order No. 1990-6, the predecessor of Administrative Order No. 1994-4, panels of this Court were not obligated to follow the decisions of previous panels. *Barbour v Dep't of Social Services,* 172 Mich App 275, 278; 431 NW2d 482 (1988). Today, however, the only way a conflict could appear is if the second panel ignored Administrative Order No. 1994-4. Accordingly, we hold that under Administrative Order No. 1994-4, a panel that is obligated to follow two conflicting opinions published after November 1, 1990, should follow the first opinion on the issue. Thus, to the extent that *Bender* conflicts with *Armstrong,* this panel is obligated to follow *Armstrong.*

As previously stated, *Armstrong* stands for the totality of the circumstances test. Having already indicated that, under the totality of the circumstances, defendant Young's statement to Sergeant Caudill was voluntary, we perceive our inquiry to be at an end. While three justices of the Michigan Supreme Court might support automatic application of art 1, § 17 of the Michigan Constitution of 1963 to suppress defendant's statements on the ground that Sergeant Caudill did not inform him of his attorney's attempts to make contact during the interrogation session, an equal number of justices would adhere to the contrary holding in *Moran, supra.* What we distill from *Wright*[4] is that a majority of the Court adheres to the totality of the circumstances test established in *Cipriano,*

---

[4] In fact, where a particular view is expressed by a minority of Supreme Court justices, which view embodies the essence of their opinions, as opposed to mere obiter dicta, and four or more justices decline to adopt that view, the better approach would appear to be to infer that, whatever the state of the law, it is definitely not that endorsed by the minority.

*supra,* and, applying that test to the facts of this case, we fail to find that defendant's confession was involuntary. *Armstrong, supra,* p 215. Accordingly, the trial court properly denied defendant's motion to suppress, and his statements were admissible and were properly considered by the trier of fact.

For the reason stated above, we decline to follow *Bender.* However, were we persuaded both that *Bender* constituted procedurally binding precedent and that it reflected a valid interpretation of Michigan law, we would not find it to be controlling under the facts of the present case.

In *Bender,* two defendants were arrested by police in the early morning hours of August 2, 1991. The families of each contacted attorneys very soon after each was apprehended. At 7:15 A.M., the mother of defendant Zeigler attempted to convey to her son a message from the attorney with whom she had spoken. However, the police did not allow her to speak to her son and refused to pass on the message. At 9:00 A.M., the attorney retained by the family of defendant Bender called the police station and asked to speak to defendant Bender. She was told that Bender's paperwork had not yet come up and that her message would be conveyed to Bender and the detective interviewing him.

Each defendant executed a written *Miranda* waiver between approximately 9:10 A.M. and 9:50 A.M., with neither being aware of the prior actions of the attorneys. Shortly thereafter, each made self-incriminating statements to law enforcement officers.

We find to be of crucial significance in *Bender* the fact that each defendant waived his right to counsel by signing a *Miranda* warnings form *after*

law enforcement officials failed to convey information from attorneys retained on their behalves. In contrast, in the present case, defendant Young signed a written waiver approximately five hours before any attempted contact by an attorney retained on his behalf. Quite simply, nothing was withheld from defendant; one cannot reasonably argue that his waiver was not knowing and intelligent. Accord *Brown, supra,* p 537. While the law countenances the imputation of knowledge under certain circumstances, extending the fiction to the retrospective imputation of ignorance is patently untenable.

Therefore, were we to consider the applicability of the *Bender* decision to the present case, we would distinguish it on this basis. We would ascribe substantially less weight to the failure of the police to inform defendant of the attempted contact of an attorney where that attempted contact occurred after the execution of a written waiver. Again, considering the totality of the circumstances, *Cipriano, supra,* we would find defendant's statements knowing, voluntary, and admissible.

Having discussed defendant's one argument on appeal that warrants extended treatment, we now address defendant's remaining contentions seriatim, and conclude that each is without merit. Defendant, by failing to raise the issue below, has failed to preserve for review the issue regarding the legality of his arrest. *People v Van Sickle,* 116 Mich App 632, 637; 323 NW2d 314 (1982). Further, our review of the record indicates that probable cause to arrest defendant existed. See *People v Turner,* 155 Mich App 222, 226-227; 399 NW2d 477 (1986). Similarly, by failing to move below for an evidentiary hearing regarding alleged ineffective assistance of counsel, defendant has limited our review to deficiencies apparent on the record. *Peo-*

*ple v Harris,* 201 Mich App 147, 154; 505 NW2d 889 (1993). We find none.

Defendant also argues that he is entitled to a new trial where the court refused to strike testimony admitted into evidence in violation of a discovery order. We find no abuse of discretion, *People v Taylor,* 159 Mich App 468, 471-472; 406 NW2d 859 (1987), where, although the prosecution did not inform defendant of the nature of certain testimony before trial, the prosecution learned that the witness would so testify only minutes before the witness was called to the stand, and, in any event, defendant had independent knowledge of the nature of the disputed testimony because it concerned his admission to the witness that he had killed the decedent.

Finally, the record discloses that defendant knowingly and voluntarily waived his right to a trial by jury. See MCR 6.402(B); *People v Shields,* 200 Mich App 554, 560-561; 504 NW2d 711 (1993).

Affirmed.

N. O. HOLOWKA, J., concurred.

WAHLS, J. *(dissenting).* I respectfully dissent because I would hold that defendant's inculpatory statements were made involuntarily and should have been suppressed. Although I find *People v Bender,* 208 Mich App 221; 527 NW2d 66 (1994), to be more persuasive than *People v Armstrong,* 207 Mich App 211; 523 NW2d 878 (1994), I agree that this panel is bound under Administrative Order No. 1994-4 to follow *Armstrong* as the earlier of two conflicting opinions published after November 1, 1990.

In this case, even applying *Armstrong,* I believe that reversal is required. The voluntariness of a confession is a question of law for the trial court's

determination. *People v Johnson,* 202 Mich App
281, 287; 508 NW2d 509 (1993). In reviewing the
trial court's determination of voluntariness, this
Court examines the entire record and makes an
independent determination of voluntariness. *Id.*
The factors that this Court should consider in-
clude:

> The age of the accused; his lack of education or
> his intelligence level; the extent of his previous
> experience with the police; the repeated and pro-
> longed nature of the questioning; the length of the
> detention of the accused before he gave the state-
> ment in question; the lack of any advice to the
> accused of his constitutional rights; whether there
> was an unnecessary delay in bringing him before a
> magistrate before he gave the confession; whether
> the accused was injured, intoxicated or drugged, or
> in ill health when he gave the statement; whether
> the accused was deprived of food, sleep, or medical
> attention; whether the accused was physically
> abused; and whether the suspect was threatened
> with abuse. [*Id.,* pp 287-288.]

Here, the refusal of the police to inform defen-
dant of the attorney's attempt to contact him is a
crucial factor in the calculus of circumstances. In
*People v Wright,* 441 Mich 140; 490 NW2d 351
(1992), Justice MALLETT and Justice LEVIN agreed
that such a refusal was enough to warrant a
reversal.

Chief Justice CAVANAGH indicated that he
agreed with Justice MALLETT's opinion "as far as it
goes," but indicated that reversal was even more
clearly supported because of police conduct that
violated the defendant's right to counsel. *Id.,* p
156. Chief Justice CAVANAGH explicitly stated that
he agreed with Justice MALLETT's reliance on the
decisions of other state courts that rejected the
reasoning of *Moran v Burbine,* 475 US 412; 106 S

Ct 1135; 89 L Ed 2d 410 (1986). *Wright, supra,* p 156, n 1. Indeed, Chief Justice CAVANAGH went further than Justice MALLETT not only by adding the rationale regarding the right to counsel, but also by including within the rule's ambit an attorney's attempt to contact a defendant at the police station by telephone. *Id.,* p 163. Accordingly, Chief Justice CAVANAGH provides a third vote that the failure of the police to inform a defendant of attempts by counsel to contact the defendant renders inculpatory statements involuntary.

In *Wright,* Justice BRICKLEY cast the deciding fourth vote, to reverse the defendant's conviction. Although he chose to write separately, Justice BRICKLEY nevertheless saw the police inaction as a critical factor in determining the voluntariness of the defendant's statements. Justice BRICKLEY wrote:

> Many cases recognize that incommunicado interrogation—the practice of consciously isolating a suspect from all friendly contact with outsiders to coerce a waiver of the right to remain silent—can undermine a person's will and make him highly susceptible to police assertiveness. [*Id.,* p 168.]

Justice BRICKLEY continued, quoting *People v Cavanaugh,* 246 Mich 680, 686; 225 NW 501 (1929):

> "[A] confession, extorted by mental disquietude, induced by unlawfully holding an accused incommunicable, is condemned by every principle of fairness, has all the evils of the old-time *lettre de cachet,* is forbidden by the constitutional guarantee of due process of law, and inhibited by the right of an accused to have the assistance of counsel." [*Wright, supra,* p 168.]

Justice BRICKLEY opined that "[i]ncommunicado

interrogation affects the voluntariness of a waiver because it suggests that coöperation will be advantageous whether or not the statements are true." *Id.,* p 169. "Statements made under these circumstances," Justice Brickley believed, easily "lose their quality as conscience-laden admissions of guilt," and "become an attempt to please the interrogating officer." *Id.* Justice Brickley wrote of the dilemma that faces an accused held incommunicado:

> Although interrogation may cease, a defendant's isolation from friendly contact with the outside world does not; it continues unabated. Continued isolation only increases the defendant's incentive to speak with the police and to comply with their demands. Failing to inform the defendant that retained counsel is available immediately leaves a suspect with two unpalatable options: waive the right to remain silent or wait in police custody, not knowing how long it might be before counsel arrives. Seen in this light, a waiver is not the product of a free and deliberate choice. Rather, it derives from a cruel Hobson's choice imposed as a result of the conscious exclusion of friendly contact with others. [*Id.,* pp 169-170.]

Although Justice Brickley proceeded to examine the other circumstances pertaining to the voluntariness of the defendant's confession, it is clear that the incommunicado nature of the defendant's interrogation played a crucial role in his thinking.

Here, the circumstances of defendant's detention are significantly more troublesome than those in *Wright.* Defendant's inculpatory statement was taken at 6:40 P.M. on September 10, 1991. Defendant was arrested at 9:00 or 10:00 P.M. the previous night. This twenty-one-hour detention contrasts with the eleven-hour detention in *Wright.*

Moreover, Sergeant Lee Caudill testified that it

was very possible that the police department's policy was that if the suspect does not request an attorney, an attorney is not allowed to see him. The accused, rather than a family member or another third party, would have to ask for an attorney. Justice BRICKLEY found this kind of official coerciveness critical in *Wright. Id.,* p 171. Here, defendant did not make any incriminating statements until confronted with the results of the polygraph examination, well after the attorney asked to speak to defendant at the police headquarters. As in *Bender, supra,* pp 231-232, had defendant been informed that an attorney had been retained for him and was waiting to speak to him, defendant might not have waived his right to counsel or his right to remain silent. See also *Wright, supra,* pp 153-154.

Other circumstances lend strong support to the unreliability of defendant's statements. During his twenty-one-hour detention before making the incriminatory statements, defendant's only food was a snack of Twinkies and soft drinks. No food was provided for breakfast. The Twinkies and soft drinks were given on defendant's request around lunch time the day after his arrest. Incredibly, defendant was given nothing else for lunch and nothing for dinner until after he made the incriminating statements at 6:40 P.M. After adding the six hours before his arrest,[1] defendant subsisted on one serving of Twinkies and soft drinks in the twenty-seven hours before his inculpatory statements!

In addition, defendant's lack of sleep is a proper

---

[1] The majority would like to disregard these six hours. However, the police conduct here exhibits an utter lack of interest regarding whether defendant was properly fed. This is clearly shown when, after fifteen hours of detention, they provided defendant with the "meal" of Twinkies and pop.

factor suggesting the involuntariness of defendant's statement. The focus is on whether defendant was "deprived" of sleep. *Johnson, supra,* pp 287-288. Here, defendant was taken to a cell that contained only a wooden bench, and no bed, cot, mattress, or other sleeping accommodations. Regardless of whether somebody is likely to get a restful night's sleep after being arrested, the furnishings of this cell made that impossible. This too is a factor militating against the holding that defendant's confession was voluntary.

In *Wright, supra,* p 172, Justice BRICKLEY, as the critical fourth and deciding vote, found that the circumstances of incommunicado interrogation, along with the deprivation of food and sleep, made the defendant's confession involuntary. Here, too, considering the circumstances of the incommunicado interrogation, along with the deprivation of food and sleep, I would hold that defendant's statements were involuntary, his convictions should be reversed, and the matter should be remanded for a new trial. *Id.; Armstrong, supra,* p 215.