PEOPLE v SEXTON

PEOPLE v DAVIS

PEOPLE v YOUNG

Docket Nos. 108195, 108749, 109143. Argued March 5, 1998 (Calendar
Nos. 3-5). Decided July 1, 1998. Rehearings denied in *Sexton* and
*Young*, 459 Mich 1203.

Corey E. Sexton was charged in the Oakland Circuit Court with first-
degree murder and possession of a firearm during the commission
of a felony. The court, Steven N. Andrews, J., denied the defend-
ant's motion to suppress inculpatory statements made to the police
after they knew counsel had requested to see him. Thereafter, the
defendant pleaded guilty of second-degree murder, conditioned on
a right to challenge the admissibility of the confessions on appeal.
While the appeal was pending, *People v Bender*, 452 Mich 594
(1996), was decided, holding that the police must inform a suspect
when retained counsel is available for consultation, and if they do
not any statement made by the defendant after the attorney's arri-
val is to be suppressed. The Court of Appeals, FITZGERALD, P.J., and
D. E. HOLBROOK, JR., and E. R. POST, JJ., reversed in an unpublished
opinion per curiam, concluding that suppression was mandated
(Docket No. 177061). The people appeal.

Clifton Davis was charged in the Detroit Recorder's Court with first-
degree murder and possession of a firearm during the commission
of a felony. At trial, the court, Maggie W. Drake, J., granted the
defendant's motion to suppress his confession, acknowledging the
possibility that he had given at least part of the statement before
his attorney arrived. *Bender* was decided while this appeal was
pending. Thereafter, the Court of Appeals, MURPHY, P.J., and
BANDSTRA and D. M. HATHAWAY, JJ., affirmed in an unpublished order
(Docket No. 171338). The people appeal.

Bryce W. Young was convicted following a bench trial in the Detroit
Recorder's Court, Wendy M. Baxter, J., of second-degree murder
and possession of a firearm during the commission of a felony. The
Court of Appeals, O'CONNELL, P.J., and N. O. HOLOWKA, J. (WAHLS, J.,
dissenting), affirmed (Docket No. 155964). The Supreme Court
remanded the case to the Court of Appeals in light of *Bender*, and
for a determination whether that decision should be applied retro-

actively. 453 Mich 976 (1996). On remand, the Court, MACKENZIE and WAHLS, JJ. (O'CONNELL, P.J., concurring in part and dissenting in part), reversed and remanded for a new trial, holding that *Bender* was to be given complete retroactive effect because it could not be said that *Bender* overruled clear and uncontradicted case law, or that it was unexpected or indefensible in light of *People v Wright*, 441 Mich 140 (1992) (Docket No. 200195). The people appeal.

In an opinion by Justice BOYLE, joined by Chief Justice MALLETT, and Justices WEAVER and TAYLOR, the Supreme Court *held*:

*People v Bender*, 452 Mich 594 (1996), applies only to interrogations that occurred after July 23, 1996.

1. The mandated federal rule of retroactivity announced in *Griffith v Kentucky*, 479 US 314 (1987), is applicable to new rules of criminal procedure grounded on the federal constitution. Because the rule of *Bender* does not implicate the federal constitution, retroactivity is not compelled and the Supreme Court is free to delineate the appropriate parameters of application. In assessing whether a decision should be applied retroactively, the purpose of the new rule, the general reliance on the old rule, and the effect of retroactive application of the new rule on the administration of justice should be examined. In light of these factors, *Bender* should not be applied retroactively. The *Bender* rule is a prophylactic rule aimed at deterring police misconduct. It is not relevant to the ascertainment of guilt or innocence and does not implicate the fact-finding process. By its nature, it can have only prospective effect on police conduct.

2. When a decision overrules settled law, more reliance is likely to have been placed in the old rule than in cases in which the law was unsettled or unknown. Judicial decisions usually are given complete retroactive effect unless the decisions are unexpected or indefensible. In announcing a rule of exclusion per se, *Bender* completely broke with past precedent. Retroactive application would be extremely disruptive to the administration of justice, undermining the validity of a large number of cases and burdening the criminal justice system with numerous retrials.

Reversed and remanded.

Justice BRICKLEY, joined by Justices CAVANAGH and KELLY, dissenting, stated that retroactive application of *Bender* is appropriate, no matter what test is applied.

By its adoption of the *Bender* rule, the Supreme Court clearly sought to protect a fundamental trial right rooted in the privilege against self-incrimination and the right to counsel. The majority's conclusion that because the doctrinal foundation for the *Bender* rule is prophylactic and aimed at preventing police conduct that

does not affect the truth-finding process, it is amenable to prospective application is unsupported by the foundation laid for the *Bender* rule. Its conclusion that *Bender* does not implicate a defendant's constitutional rights is wrong and without any viable legal support.

222 Mich App 498; 565 NW2d 5 (1997) reversed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *David Gorcyca,* Prosecuting Attorney, *Richard H. Browne,* Chief, Appellate Division, and *Kathryn G. Barnes,* Assistant Prosecuting Attorney, for the people in *Sexton.*

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people in *Davis* and *Young.*

*Robyn B. Frankel* for defendant-appellee Sexton.

*Carolyn A. Blanchard* for defendant-appellee Davis.

State Appellate Defender (by *Valerie R. Newman* and *Tracey D. Weaver*) for defendant-appellee Young.

BOYLE, J. We granted leave to determine whether this Court's holding in *People v Bender*, 452 Mich 594; 551 NW2d 71 (1996), should be applied retroactively.[1] Finding that it should not, we reverse the decision of the Court of Appeals in each case and remand for further proceedings consistent with this opinion.

---

[1] These three cases do not furnish an opportunity for this Court to revisit the holding of *Bender*. The issue before us today is simply whether the *Bender* decision should have retroactive application.

I

*PEOPLE v SEXTON*

On September 8, 1993, Damian Phillips was shot and killed. Defendant Sexton and two other young men were at the scene of the crime when the police arrived. After initial questioning, they agreed to go to the police station and give statements about the incident.[2]

Detective Melvin Marchlones questioned the defendant.[3] According to testimony given at the suppression hearing, Marchlones told the defendant that he was not under arrest and could leave at any time. In the defendant's first statement, taken about 2:23 P.M., defendant denied all culpability.

Sexton's statement was not consistent with those of the other men. Upon being confronted with the inconsistencies, he gave another statement about 4:00 P.M., claiming that the gun slipped through the victim's fingers, fell to the floor, and discharged. He testified that he asked to telephone his father before making the second statement and was told that he could do so "later."

Defendant agreed to take a polygraph test. Marchlones reminded him that he was not under arrest and reviewed the *Miranda*[4] warnings. Defendant indicated that he understood and agreed to waive his rights. Before going to Southfield for the polygraph test,

---

[2] The police questioned the defendant and two other men while sitting in a patrol car. According to the testimony of Officer Keith Lehr, the questioning was done in the police car to facilitate note taking. Lehr never told the defendant that he was under arrest.

[3] Before being questioned, the defendant was given an atomic absorption test.

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

defendant gave a third statement, claiming that the gun discharged accidentally.

Defendant was taken to the Southfield police station for a polygraph examination. Before the test began at 7:10 P.M., the polygraph examiner reviewed the *Miranda* rights. Mr. Sexton again stated that he understood the rights and would waive them.

In the meantime, at approximately 4:45 P.M., the defendant's father arrived at the Hazel Park police station and attempted to see his son. His request was denied. At approximately 5:00 P.M., the senior Mr. Sexton contacted his attorney, Neil Miller. Shortly thereafter, Mr. Miller called the Hazel Park Police Department, identified himself as defendant Sexton's attorney, and left a message asking that "whoever was holding" the defendant to return his call. Mr. Miller first arrived at the police station at approximately 7:00 P.M., where he informed the desk officer that he represented the defendant, that he wanted to see his client, and that he wanted all questioning stopped. Mr. Miller was told that the defendant was not at the police station, but was not told where he was. The desk officer refused to contact Marchlones. Miller left the police station and wrote a statement reiterating that he was defendant Sexton's lawyer and that he wanted all questioning stopped. He returned to the police station at 10:20 P.M. and delivered the statement to the desk officer, who paged Marchlones and told him that there was a lawyer at the station who wanted to speak with Corey Sexton.[5]

---

[5] Detective Marchlones first became aware of Miller's presence at 10:30 P.M.

After the polygraph was completed, the examiner advised Sexton that in his opinion defendant's answers had not been truthful. Defendant's response was monitored and he admitted that he intentionally shot Phillips. Sexton was then placed under arrest and again advised of his constitutional rights. Defendant stated that he understood the rights and did not want to talk to a lawyer before further questioning. Defendant gave a recorded statement in which he again admitted that he intentionally shot his cousin. This final statement was given at 11:35 P.M.

The defendant was charged with first-degree murder, MCL 750.316(1)(a); MSA 28.548(1)(a), and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). The defense filed a motion to suppress the defendant's inculpatory statements, but the trial court found that the statements were freely, knowingly, and voluntarily made, and denied the motion.[6]

Defendant pleaded guilty to second-degree murder, MCL 750.317; MSA 28.549, conditioned on a right to challenge the admissibility of the confessions on appeal. Sexton was sentenced to twenty to forty years for the offense, plus two years for the felony-firearm violation.

While defendant's appeal was pending, this Court decided *People v Bender, supra*. In an unpublished opinion per curiam, issued December 20, 1996 (Docket No. 177061), the Court of Appeals reversed

---

[6] Judge Andrews held on the basis of Justice BRICKLEY's concurrence in *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992), that the failure of the police to tell the defendant about a retained attorney was just one among many factors to consider using a totality-of-the-circumstances analysis.

the decision of the trial court, concluding that suppression was mandated regarding all statements made after 5:30 P.M.[7] We granted the prosecutor's application for leave to appeal.

### PEOPLE v DAVIS

Defendant Clifton Davis was charged with first-degree murder, MCL 750.316(1)(a); MSA 28.548(1)(a), and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2), in connection with the shooting death of Allen Murriel on March 10, 1993.[8]

When the police arrived, the defendant and his brother were arrested. Defendant's mother retained Elliot Margolis to represent her sons. Mr. Margolis and Mrs. Davis agreed to meet at police headquarters at 8:10 P.M.

According to testimony given at the suppression hearing, the defendant signed a waiver of his *Miranda* rights and agreed to be interviewed at 7:45 P.M. Sergeant Deborah Monti began questioning him at police headquarters.

Mrs. Davis and Mr. Margolis met at the front door of police headquarters at 8:10 P.M. Mrs. Davis paid Margolis the agreed retainer fee, and he immediately

---

[7] The Court of Appeals held that statements taken after Mr. Miller's telephone call must be suppressed. The issue of whether telephone contact is sufficient to invoke the protection of *Bender* is not before us. However, we note without comment that only Justices CAVANAGH, LEVIN, and MALLETT wrote to extend the per se rule to alternative forms of police contact. *Id.* at 617.

[8] The victim was shot and killed in the defendant's basement after a disagreement about a haircut. Also present was defendant's younger brother, Edward Davis. Defendant telephoned his mother before the police arrived. She promised to retain an attorney to represent both her sons.

went upstairs to locate the defendant and his brother. Margolis told the desk officer that he had been retained to represent the Davis brothers. The officer told Margolis that he was not certain of the location of Sergeant Monti or the defendant.

According to the testimony of Sergeant Monti, she began taking defendant's statement at 8:20 P.M. and finished at 9:20 P.M. Mr. Margolis' version of the facts differs slightly. He testified that he saw Monti move Edward Davis from one room to another at 8:45 P.M. According to Margolis, Monti told Margolis at that time that she had already taken a confession from the defendant.

At trial, the defendant moved to suppress the confession, contending that suppression was required because the police failed to tell defendant that his counsel wanted to see him. The trial court granted the motion to suppress pursuant to *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992). The trial court acknowledged the possibility that the defendant had given at least part of his statement before the attorney arrived, but suppressed the entire statement.

The Court of Appeals granted the prosecutor's interlocutory application for leave to appeal. While that appeal was pending, this Court decided *Bender*. The Court of Appeals issued a peremptory affirmance of the trial court order. We granted the plaintiff's application for leave to appeal.

### *PEOPLE v YOUNG*

James Curenton was with a group of friends on the evening of September 7, 1991. Dondrea Smith and Joseph Broom, two of Curenton's friends, testified that a man wearing a ski mask and carrying a gun

came out of an alley. Mr. Smith testified that he thought nothing of this pedestrian until the gunman started shooting.[9] At that point, the witness and the rest of the friends ran. The gunman chased Curenton and shot at him. After Curenton was on the ground, the perpetrator took a gold chain from the victim's neck and rummaged through his pockets.

On September 9, 1991, defendant was arrested for the murder of James Curenton. Defendant was placed in a holding cell for the night.

At approximately 9:20 A.M. the next morning, Mr. Young was questioned about the shooting by Sergeant Lee Caudill of the Detroit Police homicide unit. According to testimony given at the evidentiary hearing, defendant was apprised of his *Miranda* rights and voluntarily agreed to waive them before questioning. At the initial interview, defendant denied all involvement in the killing.

At 2:00 P.M., defendant was taken from the police station to the police crime laboratory for a polygraph examination. The defendant was again advised of his *Miranda* rights, and agreed to take the polygraph examination. During the examination, Caudill received a telephone call indicating that an attorney was at the police station requesting to see Bryce

---

[9] The testimony was as follows:

> Q. [Mr. Googasian]: What happened, what did you see?
> A. [Mr. Smith]: A person came out the alley with a ski mask and a gun.
> Q. All right, what happened?
> A. He walked past my friend Lamont and I didn't think nothing of it and then he just started shooting and I ran.

Young.[10] The defendant was not notified of this and the examination continued. At 6:40 P.M., defendant confessed.

The defendant's motion to suppress the statement was denied. After a two-day bench trial, defendant was convicted of second-degree murder, MCL 750.317; MSA 28.549, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Defendant was sentenced to twelve to thirty years for the murder conviction and two years for the felony-firearm violation.

The Court of Appeals affirmed defendant's conviction. 212 Mich App 630; 538 NW2d 456 (1995). We remanded the case for reconsideration in light of *Bender*, and for a determination whether that decision should be applied retroactively to this case. 453 Mich 976 (1996).

On remand, the Court of Appeals held that *Bender* was to be given complete retroactive effect because it could not be said that *Bender* overruled clear and uncontradicted case law or that it was unexpected or indefensible in light of *People v Wright, supra.* 222 Mich App 498; 565 NW2d 5 (1997).

II

The issue in this case is whether our decision in *People v Bender, supra,* should have retroactive application. As a question of law, the standard of review is de novo. *People v Carpentier,* 446 Mich 19; 521 NW2d 195 (1994). Resolution of the matter in turn rests on the decisional basis of the holding.

---

[10] The record of the evidentiary hearing does not indicate whether counsel was retained or appointed.

In *Bender*, we held that the police must inform a suspect when retained counsel is available for consultation, failing which any statement made by the defendant after the attorney's arrival would be suppressed. However, the ultimate holding of the Court was not that the rule was required by either Const 1963, art 1, § 17[11] or § 20.[12] In an opinion by Chief Justice BRICKLEY, joined by Justices LEVIN, CAVANAGH, and MALLETT, the majority expressly refrained from justifying *Bender* by interpreting constitutional provisions. Rather, the majority felt that it

> would be more appropriate to approach the law enforcement practices that are at the core of this case in the same manner as the United States Supreme Court approached the

---

[11] Const 1963, art 1, § 17 states:

[N]o person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.

[12] Const 1963, art 1, § 20 provides:

[I]n every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury, which may consist of less than 12 jurors in prosecutions for misdemeanors punishable by imprisonment for not more than 1 year; to be informed of the nature of the accusation; to be confronted with the witnesses against him or her; to have compulsory process for obtaining witnesses in his or her favor; to have the assistance of counsel for his or her defense; to have an appeal as a matter of right, except as provided by law on appeal by an accused who pleads guilty or nolo contendere shall be by leave of the court; and as provided by law, when the trial court so orders, to have such reasonable assistance as may be necessary to perfect and prosecute an appeal.

constitutional interpretation task in *Miranda* . . . ; namely, by announcing a prophylactic rule. [*Bender* at 620-621.][13]

This new per se rule of criminal procedure was implemented to insure that "our system of criminal justice remains accusatorial and not inquisitorial in nature." *Id.* at 623.

III

In *Griffith v Kentucky*,[14] the United States Supreme Court held that a new rule for the conduct of criminal prosecutions "applie[s] retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." However, *Griffith* is not applicable to the cases at bar because it applies only to rules of criminal procedure that are grounded on the United States Constitution.

In *Griffith*, the issue was whether the Court's decision in *Batson v Kentucky*[15] should be applied retroactively. In *Batson*, the Court held that a state criminal defendant could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment on the basis of a prosecutor's use of peremptory challenges to strike members of the defendant's race from the jury. Once the defendant made the prima facie showing, the burden shifted to the state to establish a racially neutral explanation for the

---

[13] The dissent maintains that we ignore the "constitutional import" of *Bender* in describing it as a prophylactic rule. *Post* at 70. "Underpinnings" notwithstanding, the *Bender* majority expressly and unequivocally described the new rule as being prophylactic in nature, declining to find that the Michigan Constitution required it.

[14] 479 US 314, 328; 107 S Ct 708; 93 L Ed 2d 649 (1987).

[15] 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986).

exclusions. Thus, *Griffith* dealt with the retroactive application on direct review[16] of a rule of criminal procedure that was constitutionally mandated.[17]

The Court explicitly accepted Justice Harlan's view of "distinguishing between cases that have become final and those that have not, and for applying new rules retroactively to cases in the latter category . . . ."[18] The Court stated that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication."[19]

This Court's holding in *Bender* is not a rule of criminal procedure that is mandated by the United States Constitution. To the contrary, the United States Supreme Court's holding in *Moran v Burbine*, 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986), specifically held that failure of the police to inform a defendant of a lawyer's efforts to contact him does not violate either the Fifth Amendment right to silence or the Sixth Amendment right to counsel.

The conclusion that *Griffith* mandates retroactive application only with respect to rules that emanate

---

[16] In *Allen v Hardy*, 478 US 255, 258; 106 S Ct 2878; 92 L Ed 2d 199 (1986), the Court held that the ruling in *Batson* was not to be applied retroactively "on collateral review of convictions that became final before [*Batson*]."

[17] The conclusion that *Griffith* applies to rules of constitutional magnitude is further demonstrated by the Court's indication that it was reviewing the "three-pronged analysis for claims of retroactivity of new constitutional rules of criminal procedure" adopted in *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965). *Griffith* at 320.

[18] *Id.* at 322.

[19] *Id.*

from the federal constitution is in accord with the approach adopted in both federal and state courts.[20]

In *Commonwealth v Waters*,[21] the issue before the Massachusetts Supreme Court was whether a new rule announced in *Commonwealth v Allen*,[22] should be applied retroactively. In *Allen*, the court announced a rule requiring a judicial determination of voluntariness whenever the issue was raised, even if the statement in question was made to a private citizen. Declining to apply *Allen* to a case pending on direct review at the time the opinion was issued, the court in *Waters* held that *"Griffith* does not require this court to give retroactive application to rules that are not based on the Federal Constitution."[23]

In *People v Erickson*,[24] one of the issues before the Illinois Supreme Court was whether the decision in

---

[20] In *Diggs v Owens*, 833 F2d 439, 442 (CA 3, 1987), the court considered the application of *Griffith* to *United States v Mauro*, 436 US 340; 98 S Ct 1834; 56 L Ed 2d 329 (1978). The court held that *"Griffith* should be confined to constitutional rules of criminal procedure and thus does not require retroactive application of new procedural decisions not constitutionally grounded."

In *Mason v Duckworth*, 74 F3d 815, 818-819 (CA 7, 1996), the court considered the application of *Griffith* to a newly adopted evidentiary rule for admitting prior inconsistent statements of witnesses in the state courts of Indiana. The court agreed with the Indiana district court that *"Griffith* only applies to new rules of federal constitutional magnitude." The court held that Indiana's "change in the rules of evidence is simply not one of constitutional proportions, and for that reason *Griffith* does not apply."

In *State v Abronski*, 145 NJ 265; 678 A2d 659 (1996), the New Jersey Supreme Court declined to retroactively apply *State v Reed*, 133 NJ 237; 627 A2d 630 (1993), which, like *Bender*, requires that the police inform a defendant of the presence of counsel. The court utilized a three-part test similar to *Hampton* in holding that *Reed* would apply prospectively to custodial confessions that occurred on or after the date of the decision.

[21] 400 Mass 1006; 511 NE2d 356 (1987).

[22] 395 Mass 448; 480 NE2d 630 (1985).

[23] *Waters* at 1007.

[24] 117 Ill 2d 271; 513 NE2d 367 (1987).

*Daley v Hett*,[25] should have retroactive application. The defendant's position was that *Hett* prohibited death penalty questioning of prospective jurors where the sentencing jury is waived before trial. The court held that the issue was left open in *Hett*. Declining to address the unanswered issue, the court found that even if *Hett* stood for the defendant's proposition, it would not be applied retroactively to the defendant's case. The court stated:

> Our reading of *Griffith* leads us to conclude that retroactivity is triggered when two factors are present: (1) the case to which the new rule is to be applied was not final or was pending on direct review when the rule was declared and (2) the rule to be applied retroactively is of constitutional dimension.[26]

The court reasoned that the right to a sentencing jury in a capital case was a statutory rather than a constitutional right, and stated that because *"Griffith* addresses a rule which pertains to a constitutional right and the defendant herein seeks retroactive application of a rule which pertains to a statutory right, we do not deem *Griffith* controlling."[27] After finding *Griffith* inapplicable, the court applied a three-part test of retroactivity first adopted by the Illinois Supreme Court in *People v Laws*.[28] The three-part test applied in *Erickson*[29] is substantively indistinguish-

---

[25]  113 Ill 2d 75; 495 NE2d 513 (1986).

[26]  *Erickson* at 289.

[27]  *Id.*

[28]  84 Ill 2d 493; 419 NE2d 1150 (1981).

[29]  The three-part test utilized in *Erickson, supra* at 290, considers the following factors in determining the applicability of retroactivity:

> (1) the purpose of the new rule, particularly whether or not it enhances the truth-seeking process; (2) the extent to which law-

able from the test of retroactivity we applied in *People v Hampton*.[30]

Because *Griffith* is not controlling, this Court is free to prescribe the parameters of retroactivity. The United States Supreme Court held in *Great Northern R Co v Sunburst Oil & Refining Co*[31] that "the Federal Constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward."

While we acknowledge the reasoning and rationale of *Griffith*,[32] we decline to apply it to the cases before us today.[33] Instead, we find the analysis in *Stovall v Denno*,[34] to be more persuasive.[35]

---

enforcement officials relied upon a prior rule of law supplanted by the new rule; and (3) the effect on the administration of justice of the retroactive application of the newly announced rule.

[30] 384 Mich 669; 187 NW2d 404 (1971).

[31] 287 US 358, 364; 53 S Ct 145; 77 L Ed 360 (1932).

[32] As a doctrine that functions to encourage serious consideration of the social costs of expansionist constitutional interpretation, the *Griffith* rationale has much to commend it. It surely is not an "absurdity" (*post* at 83, n 9) for a court, in interpreting its own organic instrument of government, to attempt to balance newly recognized rights against the burdens imposed on the administration of justice. See LaFave & Israel, Criminal Procedure, § 2.7 *et seq*.

[33] Defense counsel further urges the Court to extend retroactivity to *Bender* as the United States Supreme Court extended the rule in *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), to be retroactive to cases pending on direct appeal. *Shea v Louisiana*, 470 US 51; 105 S Ct 1065; 84 L Ed 2d 38 (1985). However, we believe that utilizing the analysis in *Stovall v Denno*, 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967), is more consistent with the purposes underlying *Bender*.

Furthermore, the basis of the *Edwards* rule is not constitutional; rather, its underpinnings refer to another prophylactic rule. In *Connecticut v Barrett*, 479 US 523, 528; 107 S Ct 828; 93 L Ed 2d 920 (1987), the Court stated that the *Edwards* rule "is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by [*Miranda's*] prophylactic purpose."

[34] 388 US 293; 87 S Ct 1967; 18 L Ed 2d 1199 (1967).

[35] See also *Desist v United States*, 394 US 244, 254, n 24; 89 S Ct 1030; 22 L Ed 2d 248 (1969). In *Desist*, the United States Supreme Court held

In *Stovall*, the United States Supreme Court addressed the retroactivity of *United States v Wade*.[36] *Wade* required the exclusion of an in-court identification that was based on a prior lineup conducted without counsel unless the in-court identification had an independent origin or was harmless error. The *Stovall* Court cited the "unusual force of the countervailing considerations" in holding that the *Wade* rule was to have total prospective application. The Court made no distinction between final convictions, convictions on direct review, and convictions at various stages of trial, holding that the "factors of reliance and burden on administration of justice" were paramount.[37] In addressing the equity argument, the Court observed that "[i]nequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making."[38]

In determining the scope of prospective application, Professors LaFave and Israel submit that reliance is a critical factor.

> If non-retroactive application is to be geared to reliance, the critical point for application of the new ruling must be the operative event regulated by that ruling, rather than the

---

that the decision in *Katz v United States*, 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), was to be applied prospectively to electronic eavesdropping that occurred after the date of the *Katz* decision.

[36] 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967).

[37] *Stovall* at 299.

[38] *Id.* at 300.

finality of the conviction. Where the new ruling was directed at a police practice, it would be applied only to police action occurring after the date of the new ruling.[39]

In holding that *Bender* is to be given prospective application only, we agree with the *Stovall* Court that no distinction should be made between final convictions, convictions on direct review, and convictions at various stages of trial.[40] We simply decline to extend *Bender*'s "court-made exclusionary rule to cases in which its deterrent purpose would not be served."[41]

IV

In *Hampton, supra,* we recognized a three-part test of retroactivity that assesses (1) the purpose of the new rules;[42] (2) the general reliance on the old rule, and (3) the effect of retroactive application of the

---

[39] LaFave & Israel, n 32 *supra,* § 2.9(c), p 125. LaFave and Israel further maintain that "where the new ruling related to a trial or other judicial proceeding, it would be applied only to cases in which that proceeding was held after the date of the new ruling." *Id.*

[40] In holding the *Bender* decision to be fully prospective, we acknowledge that our retroactivity analysis draws "no less an arbitrary line than does the federal system." *United States v Peters,* 978 F Supp 762, 777, n 18 (ND Ill, 1997).

[41] *Desist,* n 35 *supra* at 254, n 24.

[42] According to the dissent, the rule of *Bender* is not new because police "ha[d] reason to be aware" that failing to inform an accused of the presence of counsel was "impermissible." *Post* at 81. First, there is more than a hint of irony in this observation since it is the fact that the author of the dissent did not agree with the rationale of the remaining majority that forecloses the claim that *Wright* foreshadowed *Bender*. Second, the suggestion that violating "*any* factor utilized in the totality-of-the-circumstances test" is inherently illegal is inherently illogical. *Post* at 85. The *essence* of the totality-of-the-circumstances approach is the antithesis of an approach identifying any specific factor as illegal. If one factor were unlawful per se there would be no need for a holistic approach.

Finally, under *People v Phillips,* 416 Mich 63, 68; 330 NW2d 366 (1982), a rule is new where clear precedent is overruled or when an issue of first impression whose resolution was not clearly foreshadowed is decided. In *Bender,* the Court announced *for the first time* that police *must* inform a

new rule on the administration of justice.[43] We hold
that the application of these three factors to the rule
in *Bender* precludes retroactive application.

A

As noted above, the purpose of the *Bender* rule is
to provide "prophylactic" protection against potential

---

suspect of an attorney's attempted contact, failing which the suspect's
*Miranda* waiver is invalid per se and the resulting statement suppressed.

In *Teague v Lane*, 489 US 288, 301; 109 S Ct 1060; 103 L Ed 2d 334
(1989), the issue before the Court was the retroactivity of new rules to
cases on collateral review. In discussing when a rule is new, the Court
stated:

> It is admittedly often difficult to determine when a case
> announces a new rule, and we do not attempt to define the spec-
> trum of what may or may not constitute a new rule for retroactivity
> purposes. In general, however, a case announces a new rule when
> it breaks new ground or imposes a new obligation on the States or
> the Federal Government . . . . To put it differently, a case
> announces a new rule if the result was not *dictated* by precedent
> existing at the time the defendant's conviction became final.
> [Emphasis in original.]

[43] *Hampton, supra* at 674, citing *Linkletter*, n 17 *supra*.

The *Linkletter* analysis, although later abandoned by the United States
Supreme Court in favor of *Griffith*, was initially embraced by two distinct
constituencies of the Court. One viewed *Linkletter* as a means of mitigat-
ing the effect of the Warren Court's "fast-moving pace of constitutional
innovation in the criminal field." *Mackey v United States*, 401 US 667, 676;
91 S Ct 1160; 28 L Ed 2d 404 (1971) (Harlan, J., concurring in part and dis-
senting in part). The doctrine was viewed "as a way of limiting the reach
of decisions that seemed . . . *fundamentally unsound.*" *Id.* (emphasis
added).

The other view rationalized prospectivity "as a 'technique' that provided
an 'impetus . . . for the implementation of long overdue reforms, which
otherwise could not be practicably effected.' " *Id.* Commentators sug-
gested that the doctrine of nonretroactivity " 'liberated the Court to
remold the criminal process still more freely,' " knowing that expansive
criminal procedure jurisprudence would not result in the massive libera-
tion of criminal defendants from jail. LaFave & Israel, n 32 *supra*, § 2.9,
p 120.

See also Fallon & Meltzer, *New law, non-retroactivity, and constitu-
tional remedies*, 104 Harv L R 1731, 1738-1740 (1991) (discussing retroac-
tivity under the Warren Court).

*Miranda* violations by mandating suppression as a deterrence to police misconduct.[44] The *Bender* majority held that "[i]f it is deemed to be important that the accused be informed that he is entitled to counsel, it is certainly important that he be informed that he has counsel."[45] *Miranda* warnings are not constitutionally mandated. Rather, the United States Supreme Court in *Miranda* created a prophylactic set of warnings to ensure protection of Fifth Amendment rights.[46] The Supreme Court has further held that *Miranda* is to have prospective application only.[47]

Furthermore, the *Bender* rule is not relevant to the ascertainment of guilt or innocence and does not implicate the integrity of the fact-finding process. In *People v Young*,[48] the Court considered whether the Court of Appeals had correctly applied *People v Fountain*,[49] which required that a prosecutor who knows of a defendant's prior felony record proceed against the defendant as an habitual offender in the adjudication of the current felony offense, failure of which reverses the defendant's conviction as an habitual offender. The Court observed that the rule was based on "this Court's supervisory powers over the

---

[44] In declaring that *Bender* was prophylactic in nature, we assume that the *Bender* majority employed the term "prophylactic" as it is used in *Miranda*, that is, "procedural safeguards" that are not themselves constitutionally based. *Michigan v Tucker*, 417 US 433, 444; 94 S Ct 2357; 41 L Ed 2d 182 (1974). See also Grano, Confessions, Truth, and the Law (Ann Arbor: The University Press, 1996), p 175.

[45] *Id.* at 621.

[46] *Michigan v Tucker*, n 44 *supra* at 444. In *Johnson*, the Court used the *Linkletter* test in holding that *Miranda* was to apply to trials commencing after the date of the *Miranda* decision on June 13, 1966.

[47] *Johnson v New Jersey*, 384 US 719; 86 S Ct 1772; 16 L Ed 2d 882 (1966).

[48] 410 Mich 363; 301 NW2d 803 (1981).

[49] 407 Mich 96; 282 NW2d 168 (1979).

practices and procedures used in our courts"[50] and concluded:

> When a decision of this Court involves a rule which concerns the ascertainment of guilt or innocence, retroactive application may be appropriate. *People v Hampton, supra.* Conversely, a new rule of procedure adopted by this Court which does not affect the integrity of the fact-finding process should be given prospective effect.[51]

Because the doctrinal foundation for the *Bender* rule is prophylactic and aimed at preventing police misconduct that does not affect the truth-finding process, it is amenable to prospective application. Because the police acted in full compliance with the law as it existed at the time, the purpose of preventing police misconduct will in no way be served by retroactive application. The rule, by its nature, can only have a prospective effect on police conduct.

B

Because the amount of past reliance will often have a profound effect on the administration of justice, the second and third factors are often dealt with together.[52]

When a decision overrules settled law, more reliance is likely to have been placed in the old rule than in cases in which the law was unsettled or unknown.[53] Judicial decisions are generally given

---

[50] *Young* at 367.

[51] *Id.*

[52] *Hampton, supra* at 677.

[53] *People v Markham,* 397 Mich 530; 245 NW2d 41 (1976).

complete retroactive effect unless the decisions are unexpected or indefensible.[54]

The defendants in this case argue that *Bender* was foreshadowed by *People v Wright, supra.* Because of the holding in *Wright,* the defendants argue, the decision in *Bender* cannot be deemed to be unexpected. In *Wright,* four members of the Court held that the defendant's confession could not be admitted into evidence. Justice MALLETT, joined by Justice LEVIN, held that the Michigan Constitution, art 1, § 17, required the police to inform the defendant of in-person efforts by his retained attorney to contact him.[55] Chief Justice CAVANAGH agreed with Justice MALLETT's interpretation of the Michigan Constitution, but wrote separately to further cite defendant's right to assistance of counsel under Const 1963, art 1, § 20.[56] Chief Justice CAVANAGH also held that the rule should not be limited to apply only to in-person efforts to contact.[57] Justice BRICKLEY concurred that the confession should be suppressed. However, Justice BRICKLEY wrote separately to base his conclusion on a rationale distinct from that of Justices MALLETT, LEVIN, and CAVANAGH.[58] Justice BRICKLEY did not reference any provision of our constitution, but relied on a totality-of-the-circumstances analysis to find that the coercive nature of the defendant's interrogation precluded a voluntary waiver of the right to remain silent.[59]

---

[54] *People v Doyle,* 451 Mich 93, 104; 545 NW2d 627 (1996).

[55] *Id.* at 155.

[56] *Id.* at 156.

[57] *Id.* at 162.

[58] *Id.* at 164. Justice BRICKLEY focused on the defendant's due process claim and found that the defendant's confession was involuntary because of the coercive nature of his interrogation.

[59] *Id.* at 172.

Given that the majority in *Wright* did not agree that failure to allow retained counsel access to the client-mandated exclusion of the statements as a matter per se it cannot be said that *Wright* foreshadowed *Bender*. In announcing a rule of exclusion per se, *Bender* is a complete break with past precedent. As this Court held in *People v Anderson*:[60]

> The clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases. If there is merely a majority for a particular result, then the parties to the case are bound by the judgment but the case is not authority beyond the immediate parties.

Therefore, even after *Wright*, there was no established rule that mandated the exclusion of evidence when the police failed to apprise a defendant of retained counsel's attempts at contact. *Bender* could not have been foreshadowed by *Wright* where the case established no precedential value under the principle of stare decisis.

While the police could not rely on *Wright*, they could rely on the United States Supreme Court's decision in *Moran v Burbine, supra*. As noted in *Moran*, the Court held that a defendant's knowledge of his attorney's presence is irrelevant to the voluntariness of a waiver. Under *Moran*, the proper focus is on the voluntariness of the defendant's decision to speak with the full awareness and comprehension of all the information *Miranda* requires the police to convey.

---

[60] 389 Mich 155, 170; 205 NW2d 461 (1973).

Whether a statement is deemed voluntary is to be determined using a totality-of-the-circumstances analysis. As this Court said in *People v Cipriano*:[61]

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

In view of the earlier reliance on *Moran* and *Cipriano* and the lack of foreshadowing by *Wright*, before *Bender* the police could legitimately rely on the fact that an inculpatory statement would not be automatically excluded when they failed to inform a suspect of the presence of counsel hired by a third party. This legitimate reliance was reinforced through subsequent decisions of the Court of Appeals, which held that *Wright* did not establish a binding principle regarding rationale.[62] Furthermore, subsequent Court of Appeals decisions expressly refused to impose a requirement per se that the police inform a suspect of

---

[61] 431 Mich 315, 334; 429 NW2d 781 (1988).

[62] See *People v Justice*, 216 Mich App 633; 550 NW2d 562 (1996); *People v Armstrong*, 207 Mich App 211; 523 NW2d 878 (1994); *People v Brown*, 206 Mich App 535; 522 NW2d 888 (1994), remanded to the Court of Appeals 454 Mich 886 (1997).

counsel's presence. These opinions correctly employed a traditional totality-of-the-circumstances analysis in determining whether the defendant's statements were voluntary.[63]

In *Bender*, the Court announced for the first time that police *must* inform a suspect of an attorney's attempted contact, failing which the suspect's *Miranda* waiver is invalid per se and the resulting statement suppressed. Because *Bender* is a new rule of law, it is uniquely susceptible to prospective application.

As to the third factor, we find that retroactive application of *Bender* would be extremely disruptive to the administration of justice. Convictions would be called into question and evidence excluded that was obtained in full compliance with the law extant at the time the statement was given. The ultimate result might undermine the validity of a large number of convictions and burden the criminal justice system with numerous retrials. Accordingly, we hold that the decision in *Bender* is to be given prospective application only.

V

Defendants Sexton and Young also claim that their inculpatory statements should have been suppressed because they were not voluntary. As noted above, whether a statement is deemed voluntary is to be determined using a totality-of-the-circumstances anal-

---

[63] See *People v Armstrong* and *People v Brown*, n 62 *supra; People v Young*, 212 Mich App 630; 538 NW2d 456 (1995). *Young* recognized that *Armstrong* "inarguably constituted binding precedent pursuant to Administrative Order No. 1994-4." *Id.* at 638.

ysis.[64] While the voluntariness of a confession is a
question for the trial court, an appellate court must
examine the entire record and make an independent
determination of voluntariness.[65] The decision of the
trial court will not be disturbed unless clearly
erroneous.[66]

As to defendant Young, review of the record shows
that the trial court did not err in finding Bryce
Young's statement voluntary under the circumstances.
Defendant maintains that his statement was involun-
tary because he was not informed that counsel was
attempting to contact him and because he was
deprived of food and sleep for twenty-one hours. As
noted above, defendant's not being informed of the
presence of counsel is merely a factor in the determi-
nation of voluntariness.

Defendant was arrested at 9:00 P.M. on Septem-
ber 9. He was given a soft drink and a snack cake at
approximately noon on September 10, which was the
first and only occasion defendant complained about
being hungry. According to defendant's testimony at
the evidentiary hearing, he specifically requested a
soft drink. He further testified that he spoke with his
lawyer for approximately an hour and then ate a hot
meal. Any delay in eating due to speaking with coun-
sel is certainly not attributable to the police.

Furthermore, defendant's testimony at the eviden-
tiary hearing reveals that his lack of sleep was princi-
pally attributable to his "being scared" rather than
any coercive tactics on the part of the police.

---

[64] *People v Cipriano, supra* at 334.

[65] *People v Robinson,* 386 Mich 551, 558; 194 NW2d 709 (1972).

[66] *People v Cipriano, supra* at 338.

Under the totality of the circumstances, we hold that defendant Young's statement was voluntary.

As to defendant Sexton, the matter was not addressed by the appellate court. Therefore, we remand the issue to the Court of Appeals for further proceedings.

VI

In all three cases before us, the inculpatory statements of the defendants were ordered suppressed pursuant to *Bender*. Because we hold that the decision in *Bender* is to apply only to interrogations that occurred after July 23, 1996, the inculpatory statements of the defendants should not be suppressed. Accordingly, we reverse the decisions of the Court of Appeals and remand the cases for proceedings consistent with this opinion.

MALLETT, C.J., and WEAVER and TAYLOR, JJ., concurred with BOYLE, J.

BRICKLEY, J.

I

I respectfully dissent in these cases for two primary reasons. First, I believe that the time has come for us to reevaluate our retroactivity jurisprudence and align it with the current federal model. Second, I believe that the majority's retroactivity analysis is in error for two reasons: retroactivity may not even be an issue in this case because the rule set forth in *People v Bender*, 452 Mich 594; 551 NW2d 71 (1996), was clearly foreshadowed by *People v Wright*, 441 Mich 140; 490 NW2d 351 (1992), and even if I agreed with the majority regarding the applicable case law, I disa-

gree with its analysis and conclusion regarding whether the *Bender* rule should be applied retroactively.

II

The majority articulates two grounds for its apparent disinclination to apply current United States Supreme Court precedent regarding retroactivity. First, it asserts that the rule set forth in *Bender* does not have constitutional implications, and, second, federal retroactivity precedent only applies to rules of criminal procedure emanating from the federal constitution.

The majority implies throughout its analysis that the rule set forth in *Bender* has no basis in our constitution. While the *Bender* rule is prophylactic in nature like *Miranda*,[1] that fact does not detract from its constitutional underpinnings. Its very purpose is to protect a suspect's right to counsel and the privilege against self-incrimination. To deny the constitutional import of this rule is to ignore the plain language set forth in *Bender*:

> The right to counsel and the right to be free of compulsory self-incrimination are part of the bedrock of constitutional civil liberties that have been zealously protected and in some cases expanded over the years. Given the focus and protection that these particular constitutional provisions have received, *it is difficult to accept and constitutionally justify a rule of law that accepts that law enforcement investigators, as part of a custodial interrogation, can conceal from suspects that counsel has been made available to them and is at their disposal.* If it is deemed to be important that the accused be informed that he is enti-

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

tled to counsel, it is certainly important that he be informed that he has counsel. [*Id.* at 621 (emphasis added).]

In my view, the rule we adopt today requiring police to inform suspects that counsel has been retained for them insures that our system of criminal justice remains accusatorial and not inquisitorial in nature. *Perhaps more importantly, it demonstrates that experience has taught us that the good will of state agents is often insufficient to guarantee a suspect's constitutional rights.* [*Id.* at 623 (emphasis added).]

The constitutional underpinnings of *Bender* are obvious.

The majority asserts that it "assume[s] that the *Bender* majority employed the term 'prophylactic' as it is used in *Miranda,* that is, 'procedural safeguards' that are not themselves constitutionally based." *Ante,* p 62, n 44. Contrary to the majority's assumption, I assume that the *Bender* majority meant precisely what it stated:

As Justice Souter explained in *Withrow v Williams,* 507 US 680, 691; 113 S Ct 1745; 123 L Ed 2d 407 (1993): " 'Prophylactic' though it may be, in protecting a defendant's Fifth Amendment privilege against self-incrimination *Miranda* safeguards 'a fundamental trial right.' " [*Id.* at 621.]

In addition, the majority contends that "the *Bender*-rule is not relevant to the ascertainment of guilt or innocence and does not implicate the integrity of the fact-finding process." *Ante,* p 62. Again, the plain language set forth by the *Bender* majority indicates otherwise:

"Nor does the Fifth Amendment 'trial right' protected by *Miranda* serve some value necessarily divorced from the

correct ascertainment of guilt. ' "[A] system of criminal law
enforcement which comes to depend on the 'confession'
will, in the long run, be less reliable and more subject to
abuses" than a system relying on independent investigation.'
*Michigan v Tucker* [417 US] [433] 448, n 23 [94 S Ct 2357;
41 L Ed 2d 182 (1974)] (quoting *Escobedo v Illinois*, 378 US
478, 488-489 [84 S Ct 1758; 12 L Ed 2d 977] [1964]). [Some
citations omitted.]" [*Id.* at 622.]

By its adoption of the *Bender* rule, this Court
clearly sought to protect a "fundamental trial right"
rooted in the privilege against self-incrimination and
the right to counsel. Accordingly, the majority's con-
clusion that "[b]ecause the doctrinal foundation for
the *Bender* rule is prophylactic and aimed at prevent-
ing police misconduct that does not affect the truth-
finding process, it is amenable to prospective applica-
tion" is unsupported by the foundation laid for the
rule set forth in *Bender. Ante*, p 63. By deeming
*Bender* prospective only, the majority fails to heed its
own counsel that "the good will of state agents is
often insufficient to guarantee a suspect's constitu-
tional rights." *Bender* at 623. Thus, I find the major-
ity's conclusion that *Bender* does not implicate a
defendant's constitutional rights wrong and without
any viable legal support.

As an additional matter, I am not persuaded that
merely because the underpinnings of *Bender* are
grounded in the Michigan Constitution and do not
emanate from the federal constitution that we should
summarily dismiss a body of law that has undergone
decades of cautious and in-depth examination, culmi-
nating in the rule set forth in *Griffith v Kentucky*, 479

US 314; 107 S Ct 708; 93 L Ed 2d 649 (1987).[2] The Supreme Court has carefully analyzed the public policy involved in retroactive application of new rules of criminal procedure, producing a rule that protects both the constitutional rights of defendants and the state's interest in the finality of judgments. This rule is set forth in *Griffith*, which holds that newly declared constitutional rules must be applied retroactively to all cases pending on direct review with no exception for cases in which the new rule is a " 'clear break' with the past." *Id.* at 328. The failure to do so "violates basic norms of constitutional adjudication." *Id.* at 322. Moreover, the "integrity of judicial review requires that we apply that rule to all similar cases pending on direct review" and the failure to do so "violates the principle of treating similarly situated defendants the same." *Id.* at 323. The failure to give the appropriate measure of consideration to these important concerns and the resulting decision not to accord the *Bender* rule retroactive effect also violates the "basic norms of constitutional adjudication" and the "integrity of judicial review."

The majority also fails to give appropriate consideration to the analysis set forth in *Shea v Louisiana*, 470 US 51; 105 S Ct 1065; 84 L Ed 2d 38 (1985), in which the Supreme Court held that the rule of *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L

---

[2] The majority observes that the "conclusion that *Griffith* mandates retroactive application only with respect to rules that emanate from the federal constitution is in accord with the approach adopted in both federal and state courts." See *ante*, pp 55-56. I agree; it is a fairly basic principle of law that United States Supreme Court precedent does not *control* decisions based on state law, constitutional or otherwise. The issue presented in this case is not whether we *must* apply *Griffith*, but whether we *should*.

Ed 2d 378 (1981), would be applied retroactively to cases not yet final, that is, those cases pending on direct review.[3] In *Edwards*, the Supreme Court held that once an accused has asserted the right to counsel, "the interrogation must cease until an attorney is present." *Id.* at 485. The protection set forth in *Edwards* is clearly rooted in *Miranda*:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. [*Id.* at 484.]

Likewise, *Bender* is also rooted in *Miranda*-like protections and should be afforded retroactive effect just as was *Edwards*. Even if the majority was correct in its assessment that the *Bender* rule is not rooted in the protection of constitutional rights, the same rule of retroactivity applies where a "prophylactic" rule is at issue.

The analyses set forth in *Shea* and *Griffith* are based on *United States v Johnson*, 457 US 537; 102 S Ct 2579; 73 L Ed 2d 202 (1982), which examined the difficulties and inconsistencies in the long evolution of retroactivity jurisprudence. The majority relies heavily on our decision in *People v Hampton*, 384 Mich 669; 187 NW2d 404 (1971), which is based on *Linkletter v Walker*, 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965), and also on the analysis set forth in *Stovall v Denno*, 388 US 293; 87 S Ct 1967; 18 L Ed 2d

---

[3] *Edwards* was not applied retroactively to cases pending on collateral review. See *Solem v Stumes*, 465 US 638; 104 S Ct 1338; 79 L Ed 2d 579 (1984). This comports with the distinction outlined in *Griffith* between those cases pending on direct review and those on collateral review.

1199 (1967). However, the Supreme Court noted in *Johnson*:

> Because the balance of the three *Stovall* factors inevitably has shifted from case to case, it is hardly surprising that, for some, "the subsequent course of *Linkletter* became almost as difficult to follow as the tracks made by a beast of prey in search of its intended victim." [*Id.* at 544.]

These factors have also been "attacked as being both difficult to apply and easy to manipulate to reach a desired result." Moody, *Retroactive application of law-changing decisions in Michigan*, 28 Wayne L R 439, 455 (1982). The reliance factor "merits little protection when, as is the case where the retroactivity of constitutional procedural rights is at issue, a criminal defendant's life or liberty is at stake." *Id.* Finally, the administration of justice factor has also been labeled as "easily subject to misuse and distortion so as to justify a court's predetermined non-retroactivity result." *Id.* The factors utilized by the majority have been called into question again and again. I believe that the time has come for us to reexamine retroactivity.

After examining the numerous opinions authored by Justice Harlan on the issue of retroactivity, the Supreme Court agreed that " '[r]etroactivity' must be rethought." *Johnson* at 548. The Court concluded, in accordance with Justice Harlan's view, that a decision from it construing the Fourth Amendment is to be applied to all convictions not yet final at the time the decision was rendered. *Id.* at 562.

The Court looked approvingly on two statements of Justice Harlan in particular:

"We do not release a criminal from jail because we like to do so, or because we think it wise to do so, but only because the government has offended constitutional principle in the conduct of his case. And when another similarly situated defendant comes before us, we must grant the same relief or give a principled reason for acting differently." *Desist v United States,* 394 US [244, 258; 89 S Ct 1030; 22 L Ed 2d 248 (1969)] (dissenting opinion). Applying *Payton* [*v New York,* 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980)] to convictions that were not yet final when *Payton* issued would accomplish the first step toward "turning our backs on the ad hoc approach that has so far characterized our decisions in the retroactivity field and proceeding to administer the doctrine on principle." *Jenkins v Delaware,* 395 US [213, 224; 89 S Ct 1677; 23 L Ed 2d 253 (1969)] (Harlan, J., dissenting). [*Id.* at 561-562.]

I agree with Justice Harlan's assessments regarding retroactivity. Not only does fairness require that similarly situated defendants be treated the same, but the majority offers no "principled reason" for doing otherwise. We, too, should take this opportunity to "turn our backs on the ad hoc" and inconsistent retroactivity jurisprudence and to mind Justice MOODY's observation:

Selective application of the benefit, and perhaps also the burden, of the change to one party and not to others similarly situated is difficult to justify in view of the fact that it is often pure happenstance that leads a court to select one case rather than another as a vehicle for an overruling or first-impression decision. [Moody, *supra* at 446.]

The test employed by the majority "fails to consider the 'hardship and inequity suffered by those who are denied the benefit of the new rule and compelled to bear the burden of what is now admittedly recognized as an unjust rule.' " *Id.* at 456.

More important, this Court has already examined and adopted the more recent retroactivity analysis set forth by the Supreme Court. Contrary to the majority's analysis, we have previously utilized federal retroactivity analysis post-*Linkletter*, and our own jurisprudence did not stagnate with the *Hampton* decision. Not only is there a failure to undertake the task of determining whether we should apply current federal retroactivity precedent in this case, there is a disregard of other decisions of this Court doing so.[4]

The fact that we did not cease utilizing federal retroactivity precedent after the adoption of *Linkletter* in *Hampton* is evidenced by several decisions from this Court. In *People v Gay*, 407 Mich 681, 705; 289 NW2d 651 (1980), we noted our adoption of *Linkletter*; however, we proceeded to state that "the United States Supreme Court has since determined that the question whether a double jeopardy holding should be given retroactive effect is 'not readily susceptible of analysis under the *Linkletter* line of cases.' " Citing *Robinson v Neil*, 409 US 505, 508; 93 S Ct 876; 35 L Ed 2d 29 (1973).

The issue presented in *Gay* was the retroactive application of *People v Cooper*, 398 Mich 450, 460-461; 247 NW2d 866 (1976), in which we held that limitations existed under the Michigan Constitution on the state's ability to prosecute a defendant in a state court following a conviction in federal court for crimes arising out of the same acts. *Gay* still used the

---

[4] While I do not believe that we should blindly apply federal retroactivity precedent to cases involving principles of state law, I also do not believe that we should blindly ignore it. We have a tradition of reviewing federal courts for guidance in this area. Undertaking an analysis of the current applicable federal retroactivity precedent is appropriate and consistent with our own jurisprudence.

*Linkletter* factors in its analysis in accordance with Supreme Court dictates. However, the *Gay* Court noted that "many of the decisions of the United States Supreme Court in recent years demonstrate a growing limitation upon the concept of dual prosecution originally approved [by it]." *Id.* at 707. Thus, previous reliance on the dual sovereignty concept was recognized as "dubious." *Id.* at 708. We concluded that "retrospective application of the *Cooper* rule is required to assure the fair distribution of a fundamental right." *Id.* at 709.

As noted above, the majority characterized the *Bender* rule as safeguarding "a fundamental trial right" in spite of its prophylactic nature. *Bender* at 621. As in *Gay, Bender* involves a fundamental right mandating retroactive application and the fact that *Bender,* like *Gay,* is grounded in the protection of state constitutional rights does not control whether we should apply the current federal retroactivity model.

Next, in *People v Woods,* 416 Mich 581; 331 NW2d 707 (1982), we decided whether our decision in *People v Wright,* 408 Mich 1; 289 NW2d 1 (1980), based on *Sandstrom v Montana,* 442 US 510; 99 S Ct 2450; 61 L Ed 2d 39 (1979), was retroactive. *Wright* and *Sandstrom* held that due process is violated when the jury is instructed that the law presumes that a person intends the ordinary consequences of his voluntary acts where a reasonable juror would interpret the presumption as conclusive or as shifting the burden of persuasion to the defendant on the issue of intent. *Woods* at 612. In deciding whether to apply these cases retroactively, we utilized the analysis set forth in *Johnson, supra,* "the Supreme Court's most recent

opinion on retroactivity," in spite of that decision's express limitation of its analysis to Fourth Amendment violations. *Woods* at 616.[5]

Still utilizing the *Linkletter* factors, we first concluded that, given the reliance by lower courts on unreversed cases approving these jury instructions, "the effect full retroactivity would have on Michigan's system of justice is unacceptable. Since this Court long approved of such instructions, the number of cases where this instruction was used is surely enormous. Taking this into consideration with the purpose of the *Sandstrom* rule, we feel full retroactivity is unwarranted." *Woods* at 621. However, we went on to hold:

> [R]etroactive application to those defendants whose cases were pending on direct appeal when *Sandstrom* was decided is required if the issue was properly raised and preserved. *United States v Johnson, supra,* which allowed retroactive application of *Payton, supra,* to cases pending on direct appeal, was specifically limited to decisions involving the Fourth Amendment. *However, it clearly manifested a preference for limited retroactivity since it is consonant with the Court's original understanding of retroactivity in* Linkletter, *does justice to "each litigant on the merits of his own case," and furthers the goal of giving similar treatment to defendants similarly situated.* We find these reasons equally applicable to this case. [*Id.* at 621-622 (citations omitted; emphasis added).]

---

[5] Apparently we took notice of Justice MOODY's observation that the "simplicity and clarity of the limited retroactivity rule adopted by the *Johnson* Court stands in stark contrast to the relative inconsistency, in analysis and result, in Michigan retroactivity decisions. More importantly, however, the United States Supreme Court's agreement with Justice Harlan's statement in *Desist* that retroactivity needs to be rethought will, hopefully, provide further impetus for such rethinking in Michigan." Moody at 509, n 359. Unfortunately, the majority retreats from our foray into simplicity, clarity, and consistency.

We essentially applied the same rule set forth by the Supreme Court in *Johnson*, *Shea*, and *Griffith*, that is, a new rule applied retroactively to all cases pending on direct appeal at the time of decision where the issue was properly raised.[6] Unlike the present situation, the decision in *Woods* was applied retroactively, despite the fact that this Court had "long approved" such instructions. As will be discussed in more detail below, the police conduct denounced in *Bender* has not been "long approved" by this Court, at the very least not since our decision in *Wright*.

### III

#### A

I find that the majority erred in its retroactivity analysis for two reasons. First, although it engaged in a "foreshadowing" analysis in the context of the second and third factors of *Hampton*, the majority misapprehends one of the primary purposes of this type of analysis. The majority acknowledges that judicial decisions are to be given complete retroactive effect. *People v Doyle*, 451 Mich 93, 104; 545 NW2d 627 (1996). However, it fails to note that " '[c]omplete prospective application has generally been limited to decisions which overrule clear and uncontradicted case law.' " *Id.*, quoting *Hyde v Univ of Michigan Bd of Regents*, 426 Mich 223, 240; 393 NW2d 847 (1986). Moreover, *only if* the decision is "unexpected" or "indefensible" in light of the law in place at the time

---

[6] For purposes of "limited retroactivity," the phrase "pending on appeal" is construed to include only those cases pending on timely direct appeal from the trial court to the Court of Appeals or on timely application to the Michigan Supreme Court from the Court of Appeals. Moody at 470.

of the conduct in question does retroactive application of the new decision even become problematic. *Id.*

Thus, before any question of the retroactive application of a decision arises, "it must be clear that the decision announces a new principle of law." *People v Phillips*, 416 Mich 63, 68; 330 NW2d 366 (1982). A rule of law is "new" for purposes of retroactivity analysis "either when an established precedent is overruled or when an issue of first impression is decided which was not adumbrated by any earlier appellate decision." *Id.*[7] Albeit for different reasons, four members of this Court, in *Wright*, found the police officers' failure to inform a suspect of an attorney's presence to be impermissible police conduct. I cannot conclude that after *Wright*, the police did not have reason to be aware that withholding information regarding the presence of an attorney from a suspect was impermissible. Therefore, *Bender* is not a "new rule" within the meaning of *Phillips*.

Simply because *Wright* did not create an exclusionary rule per se does not lead to the conclusion that it did not foreshadow *Bender*. The majority evidently equates foreshadowing with the principle of stare

---

[7] The majority refers to the definition of "new rule" found in *Teague v Lane*, 489 US 288, 301; 109 S Ct 1060; 103 L Ed 2d 334 (1989). See *ante*, p 61, n 42. However, this Court currently uses the definition articulated in *Phillips*, *supra*. If it is the desire of the majority to overrule *Phillips*, it may certainly do so. In this vein, much of the disagreement between the majority and the dissent in this case lies in the answer to the question when should we apply federal precedent. Both could endlessly throw stones about which position is most true to federal jurisprudence for every nuance of every issue presented in this case, and both may even be right. However, the underlying premise of my view is that, with regard to the issue of retroactivity, we should follow federal precedent instead of continuing to apply the confusing, heavily criticized, and easily manipulated test utilized by the majority.

decisis. However, had *Wright* created the exclusionary rule per se that the majority seems to think was necessary,[8] not only would retroactivity of the *Bender* rule not be an issue, it need not have been decided at all (because *Wright* already would have done so). Therefore, equating foreshadowing with stare decisis renders the foreshadowing analysis pointless.

Presumably, the majority would conclude that the police are not sufficiently aware of the impermissibility of engaging in any relevant factor utilized in the totality-of-the-circumstances test for voluntariness simply because the violation of any one factor might not result in an exclusion of evidence per se. However, official awareness of an exclusionary rule per se is *not* the same as official awareness that certain conduct is simply not allowed. Police misconduct is police misconduct, regardless of the consequences. The majority overlooks such misconduct simply because the police were unaware that the fruit of their misconduct would be absolutely inadmissible at trial. I submit that conduct so clearly contrary to *Wright* should not be rewarded.

Accordingly, I cannot agree with the majority's conclusion that *Bender* was not clearly foreshadowed by *Wright*, and, thus, *Bender* cannot be properly characterized as a "new rule." The majority's foreshadowing analysis is quite similar to the government's argument soundly rejected in *Johnson*:

---

[8] "Given that the majority in *Wright* did not agree that failure to allow retained counsel access to the client-mandated exclusion of the statements as a matter per se it cannot be said that *Wright* foreshadowed *Bender*." *Ante*, p 65.

[T]he only Fourth Amendment rulings worthy of retroactive application are those in which the arresting officer violated pre-existing guidelines clearly established by prior cases. *But as we have seen above, cases involving simple application of clear, pre-existing Fourth Amendment guidelines raise no real questions of retroactivity at all.* Literally read, the Government's theory would automatically eliminate all Fourth Amendment rulings from consideration for retroactive application. [*Id.* at 560 (emphasis added).]

This is precisely what the majority seeks to do here: Unless settled principles are applied, the decision should not be retroactive. In doing so, the majority distorts retroactivity jurisprudence and effectively renders engaging in retroactivity analysis in the future an exercise in futility by disallowing retroactive application of any rule that could possibly be characterized as "unsettled" in any infinitesimal way.

B

The majority's second error lies in its analysis of the *Hampton/Linkletter* factors.[9] The three factors applied by the majority are set out in *Hampton* and

---

[9] I find the majority's retroactivity analysis analogous to the retroactivity test found to be an "absurdity" by the Supreme Court in *Johnson.* Long before the decision regarding arrests without warrants, whose retroactive application was at issue in *Johnson,* the Court had "questioned the constitutionality of warrantless home arrests." *Id.* at 560. The Court, in rejecting the government's argument that only *settled* Fourth Amendment issues should be applied retroactively, stated:

Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord any retroactive effect to Fourth Amendment rulings would "encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach." [*Id.* at 561.]

analyze: (1) the purpose of the new rule, (2) the general reliance on the old rule, and (3) the effect of retroactive application of the new rule on the administration of justice. Contrary to the majority's assertions[10] regarding the purpose of the *Bender* rule, the *Bender* majority found the *Bender* rule necessary to protect "a fundamental trial right" that serves a value not "necessarily divorced from the correct ascertainment of guilt." *Bender* at 620-621.[11] Thus, the *Bender* rule is fully amenable to retroactive application, even under the law as so narrowly viewed by the majority.[12]

The majority's assertions that the "police acted in full compliance with the law as it existed at the time" and that "the purpose of preventing police misconduct will in no way be served by retroactive applica-

---

Given that a majority of this Court in *Wright* clearly expressed the "dubious constitutionality" of the failure to inform a suspect of the presence of an attorney, I believe that the police had sufficient notice that such a practice was impermissible. The majority's decision gives the police little incentive to err on the side of a defendant's constitutional rights. It permits the police to disregard our decisions, adopting a let's-wait-until-we-absolutely-cannot-get-the-evidence-in-when-we-violate-a-defendant's-constitutional-rights approach.

[10] As already noted, the majority asserts that the "purpose of the *Bender* rule is to provide 'prophylactic' protection against potential *Miranda* violations by mandating suppression as a deterrence to police misconduct." *Ante*, pp 61-62. In addition, "the *Bender* rule is not relevant to the ascertainment of guilt or innocence and does not implicate the integrity of the fact-finding process." *Ante*, p 62.

[11] It is true that *Miranda* warnings are not mandated by the federal constitution. See *ante*, p 62. However, *Bender* is rooted in the protection of Michigan constitutional rights, and what this Court held in *Bender* is controlling, not what the United States Supreme Court has stated about *Miranda*. As the majority points out, federal law does not control the issues presented in this case.

[12] " 'When a decision of this Court involves a rule which concerns the ascertainment of guilt or innocence, retroactive application may be appropriate.' " *Ante*, p 63, quoting *People v Young*, 410 Mich 363, 367; 301 NW2d 803 (1981).

tion" are inconsistent with the plain import of *Wright* and with its admission that the Court of Appeals, subsequent to *Wright,* "correctly employed a traditional totality-of-the-circumstances analysis in determining whether the defendant's statements were voluntary." *Ante,* p 67.

First, if *Wright* had established such a rule, *Bender* not only would have been an unnecessary decision, it could not possibly implicate retroactivity. Second, if failure to inform a suspect that an attorney was waiting to speak with him is an appropriate factor to be utilized in the test for voluntariness, then how could the police possibly be unaware that such behavior was inappropriate? Third, the violation of *any* factor utilized in the totality-of-the-circumstances test simply cannot be characterized as "full compliance with the law."[13] Fourth, the prevention of police misconduct certainly will be furthered by retroactive application of *Bender* because no legitimate reason existed for the police to ignore *Wright* and any reliance placed elsewhere is simply unjustified.

---

[13] The majority says that the "*essence* of the totality-of-the-circumstances approach is the antithesis of an approach identifying any specific factor as illegal." See *ante,* p 60, n 42. There is a decided difference between violating a factor in the totality of the circumstances and creating an exclusionary rule per se. However, the majority's logic means that the police do not know that violating any factor so utilized is impermissible conduct unless and until a court has determined, after the fact, that a defendant's statement was involuntary. Essentially, the police may then violate a certain quantum of factors before the behavior becomes "illegal." The consequences of one's actions do not necessarily determine whether the action taken is itself legal. If the majority was correct, whatever would be the purpose of articulating the factors to be used in a totality-of-the-circumstances test? None by themselves are "illegal." In my view, the purpose of articulating the factors is to place the police on notice of what behavior is appropriate and what behavior is not. Here, the police were on clear notice, and, thus, their behavior was not "legal" as the term is used by the majority.

In applying the third *Hampton* factor, the majority asserts that if *Bender* was applied retroactively, "[c]onvictions would be called into question and evidence excluded that was obtained in full compliance with the law extant at the time the statement was given." *Ante*, p 67. There is no burden on the administration of justice where we require the police to follow the rules set forth by this Court that are designed to protect fundamental constitutional rights, i.e., *Wright*. Again, the majority's decision permits the police to ignore the plain significance of our decision in *Wright* simply because *Wright* did not adopt an exclusionary rule per se. It is this ultimate conclusion that I find illogical, legally unjustifiable, and constitutionally offensive.

IV

In sum, I believe we should take the significant step of adopting the consistent, simple, and clear approach to retroactivity utilized by the federal courts. In addition, the majority's retroactivity analysis is in error for two reasons: *Bender* is not a "new rule" of law because it was foreshadowed by *Wright*, and application of the *Hampton/Linkletter* factors mandates retroactive application of *Bender*. Accordingly, I conclude that retroactive application of *Bender* is appropriate, no matter the test applied.

CAVANAGH and KELLY, JJ., concurred with BRICKLEY, J.